Gail A. LAREAU and Michael Lareau, Individually, and as Parents and Next Friends of Ashley Lareau and Christopher Lareau, Plaintiffs,

v.

Larry K. PAGE, M.D.; American Cyanamid Company; Sequa Corporation; Chromalloy Pharmaceutical, Inc.; Forest Pharmaceutical Laboratories, Inc.;[1] Tenneco Inc.; and Tennessee Gas Pipeline Company, Defendants.

Civ. A. No. 90–11629–Y.

United States District Court, D. Massachusetts.

Dec. 27, 1993.

---

1. Although named in the original complaint, the plaintiffs' amended complaint dropped Forest Pharmaceutical Laboratories, Inc. as a defendant. This action is, therefore, dismissed without prejudice as to Forest Pharmaceutical Laboratories, Inc.

**922**

Joan A. Lukey, Mark G. Matuschak, Hale & Dorr, Boston, MA, for Gail A. Lareau and Michael Lareau.

Lionel H. Perlo, Ficksman & Conley, John D. Cassidy, Ficksman & Conley, Boston, MA, for Larry K. Page.

Rebecca J. Benson, Thomas J. Sartory, Ronald B. Shwartz, Goulston & Storrs, Boston, MA, for American Cyanamid Co. and Tennessee Gas Pipeline Co.

Lawrence G. Cetrulo, Kevin E. Young, Peabody & Arnold, Michael J. Grace, Burns & Levinson, Boston, MA, for Sequa Corp. and Chromalloy Pharmaceuticals, Inc.

Mark E. Cohen, McCormack & Epstein, Boston, MA, for Forest Pharmaceutical Laboratories, Inc.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

In this action the plaintiff, Gail Lareau, her husband Michael Lareau, and their children, Christopher and Ashley, allege a variety of personal injury and product liability claims against Dr. Larry K. Page and six corporate defendants. Gail Lareau brings claims for negligent rendition of medical care, negligent infliction of emotional distress, and violations of the Massachusetts Consumer Protection Act, Mass.Gen.L. ch. 93A, against Dr. Page. Gail Lareau also alleges causes of action in negligence, breach of warranty, failure to warn, negligent infliction of emotional distress, and violations of Mass.Gen.L. ch. 93A against the corporate defendants. Her husband and children bring claims against all the defendants for loss of consortium, including loss of companionship and affection, negligent infliction of emotional distress, and violations of Mass.Gen.L. ch. 93A.

Dr. Page and the corporate defendants Sequa Corporation ("Sequa") and Chromalloy Pharmaceutical, Inc. ("Chromalloy") moved for summary judgment, arguing that Gail Lareau's claims are barred by the relevant statutes of limitation, and that the other plaintiffs' claims, being derivative, fail in turn. The plaintiffs opposed the motions, contending first that, at the time of the accrual dates suggested by the defendants, Gail Lareau was not on notice of her injury, and second, that there are separate accrual dates for the claims advanced by the minor children and Michael Lareau. This Court, disagreeing entirely with the plaintiffs' first contention, agreeing only in part with the second, and recognizing that the evidentiary record submitted by the parties presented no material factual dispute, granted the defendants' motions on all claims advanced by Gail, Michael, and Ashley Lareau, and granted in part and denied in part the motions concerning the claims advanced by Christopher Lareau.

While the Court was considering the statute of limitations issue, the pharmaceutical companies moved for summary judgment on the ground of the learned intermediary rule. After further pre-trial proceedings, this Court allowed this motion on the eve of trial.

Christopher Lareau's claim for loss of consortium against Dr. Page survived all these rulings. After an ably-presented five day trial, the ten person [2] jury answered "No" to

---

2. The local rules in this district provide for civil juries of not less than six. Local Rule 48.1. This Court routinely empanels ten persons on a civil jury and sends them all to deliberate, *Cabral v. Sullivan,* 757 F.Supp. 107, 108 (D.Mass.1991), *aff'd in part, rev'd in part,* 961 F.2d 998 (1st Cir.1992), since the best available studies show that the small group dynamics of juries function best in the ten to fourteen person range. *See, e.g.,* G. Thomas Mustermann, *A Comparison of the Performance of Eight– and Twelve–Person Ju-*

the question "Do you find that any negligence on the part of Dr. Page caused injury to Mrs. Lareau?" Consonant with the judgment of the jury and the rulings of the Court, the clerk thereupon entered judgment for all the defendants on all of the plaintiffs' claims. Christopher Lareau promptly moved for a new trial. After hearing, the Court denied that motion on December 20, 1993.

This memorandum explains these rulings.

## I. UNDISPUTED FACTS—THE SUMMARY JUDGMENT RECORD

In March, 1970, Gail Lareau (then Melanson) was admitted to Children's Hospital in Boston and referred to Dr. Larry K. Page, a neurosurgeon. Dr. Page performed a craniotomy and drained a left frontal cerebral abscess, injecting a small amount of Thorotrast, a radioactive contrast dye, to facilitate post-operative observation of the abscess cavity.

Post-surgery, Mrs. Lareau remained healthy for some years, married Michael Lareau and gave birth to their first child, Christopher. On June 13, 1984, she arrived at the Burbank Hospital in Fitchburg complaining of severe headaches. On admission she was found to be having a grand mal seizure. Her attending physician, Dr. Richard Cornell, noted that the CAT scan taken on admission revealed a "large calcified mass in the left brain due to the old lesion." In the discharge summary, Dr. Cornell also noted "a density overlying the lateral aspect of the left frontal sinus ... due to retained contrast placed at the time of removal of her brain abscess, rather than calcification." Mrs. Lareau herself never saw these reports.

Upon her discharge from Burbank Hospital, Mrs. Lareau was referred to Dr. Edwin G. Fischer, a neurosurgeon at Boston's Children's Hospital. Two weeks after her consultation with Dr. Fischer, Mrs. Lareau received a letter dated July 6, 1984, in which he warned her that there was "a theoretical possibility" that "the Thorotrast that was left following the treatment of your brain abscess" could "induce a tumor in surrounding brain tissue over a total period of about 20 years." Dr. Fischer recommended surgical

removal. In her deposition testimony, Mrs. Lareau said Dr. Fischer's recommendation had come as a "big shock," both because her understanding at the end of their meeting had been that "everything was fine," and because she had never before heard the word Thorotrast.

On September 12, 1984, she went for a second opinion from Dr. R. Michael Scott, a neurosurgeon at New England Medical Center who, while confirming the existence of the Thorotrast residue, declined to recommend surgery unless his own research on Thorotrast turned up "good evidence that a problem really does exist." Mrs. Lareau, after consulting with Dr. Cornell, decided not to go ahead with surgery on "just a theoretical possibility."

Mrs. Lareau continued to see Dr. Fischer, returning in September, 1985 and again in March, 1987 for cranial CAT scans and consultations. Both scans indicated the presence of the Thorotrast, and no indication of tumor formation. In 1986, Ashley Lareau was born. In a letter dated November 11, 1988, Dr. Fischer informed Mrs. Lareau of a recently reported case in which a tumor had been found twenty-one years after Thorotrast had been used during brain surgery. Cautioning Mrs. Lareau that " ... this is sufficient cause for us to reconsider things and obtain a new scan ...," he urged her to come in as soon as possible. Mrs. Lareau went to see Dr. Fischer in March, 1989. She described that visit as having been prompted by her worsening "headaches," and said Dr. Fischer reported that "everything looked fine according to my scan" and once again recommended surgery to remove the Thorotrast, this time referring to the report of brain cancer in the literature.

Mrs. Lareau maintains it was not until June 16, 1989, when she watched a report on the dangers of Thorotrast on the ABC News program *20/20* that she discovered the harm done to her by the defendants' actions. Mrs. Lareau stated that after the program "[she] was an emotional wreck" and began to suffer worsening headaches and painful "pulling" sensations allegedly attributed to her emo-

*ries* (Williamsburg, Va.: National Center for State Courts, 1990).

tional distress. In the spring of 1990, she went to the Massachusetts General Hospital ("MGH") to see a new neurologist, Dr. Amy Pruitt, who referred her to a neurosurgeon, Dr. Robert Ojemann.[3] Mrs. Lareau had surgery to remove the Thorotrast on August 13, 1990, shortly after having begun legal action against Dr. Page and the corporate defendants. The surgical report revealed a calcified mass caused by the Thorotrast, a Thorotrast "granuloma." Post-surgery, Mrs. Lareau suffered painful cranial swelling and exhaustion, and was unable to leave her house. Her emotional distress, the accompanying worsening headaches, and the surgery have affected her relationship with her husband, Michael. Both Ashley and Christopher Lareau have suffered emotional problems relating to their mother's condition, and Christopher has received necessary psychological counselling concerning such emotional problems.

Neither Sequa nor Chromalloy ever distributed or manufactured Thorotrast. Chromalloy is and always has been an independent and wholly-owned subsidiary of Chromalloy American Corporation which, in turn, is an independent and wholly-owned subsidiary of Sequa. The plaintiffs allege that Chromalloy, as a result of a merger, succeeded to the Thorotrast-related liabilities of Fellows Medical Manufacturing Company, Inc. which, for a limited period of time, manufactured and distributed Thorotrast and, apparently, was the only company so engaged. Because the Court must examine the record "in the light most favorable to . . . the party opposing the motion," *Poller v. Columbia Broadcasting Sys. Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), Sequa and Chromalloy recognize that, on this mo-

tion, the Court must accept as true the plaintiffs' allegations that Sequa and Chromalloy are liable, as successor corporations, for Thorotrast-related liabilities of Fellows Medical Manufacturing Company, Inc.

Assuming, *arguendo*, that the Thorotrast prescribed by Dr. Page was manufactured by a company for whose actions the defendants might be liable, the Thorotrast would have been distributed sometime between November 18, 1966 and the end of November, 1968 by Fellows–Testagar Co., a Division of Fellows Medical Manufacturing Company, Inc. ("Fellows–Testagar"). This is so because: (1) Mrs. Lareau received the Thorotrast on March 31, 1970; (2) Thorotrast was not distributed for human use in the United States from about June 2, 1964 until about November, 1966, when the FDA approved a New Drug Application; (3) Fellows–Testagar ceased manufacturing and distributing Thorotrast for human use in 1968; and (4) Thorotrast manufactured in the 1960s had a "shelf-life" of five years. Therefore, given the product's "shelf-life" and distribution history, the Thorotrast prescribed to Mrs. Lareau must have been manufactured after March 31, 1965, and must have been distributed after November, 1966 and before December 1, 1968.[4]

From November 18, 1966 until it ceased distributing Thorotrast in 1968, Fellows–Testagar's warnings had three components: (1) each vial of Thorotrast had a warning label ("vial label"); (2) the carton in which the vials were packaged had a warning label ("package label"); and (3) a seven page insert was included in each carton ("package insert").[5]

---

**3.** Lareau also consulted by phone with Dr. Joseph Heller, the purported expert who appeared on *20/20*, who reviewed her records and suggested that she consider having the Thorotrast removed.

**4.** There is no evidence that Dr. Page used Thorotrast whose expiration date had lapsed. Therefore, there is no evidence that the Thorotrast used was manufactured or distributed prior to June 2, 1964.

**5.** The package label stated in pertinent part:
WARNING: This is a very dangerous drug . . .

WARNING: Read package insert thoroughly before using this drug . . .
WARNING: For use only when this drug has a unique clinical usefulness, and there is substantial evidence of limited life expectancy by reason of disease or advanced age. For indications, dose, and administration, see the enclosed insert. . . .
Any patient who receives this drug should be notified of its chronic (or long term) toxicity. . . .
The vial label further warned:
WARNING: THIS IS A VERY DANGEROUS DRUG.

The FDA specifically approved the labels used by Fellows–Testagar, and the labelling of Thorotrast remained unchanged throughout the 1966–1968 period.

## II. ANALYSIS

### A. Statutes of Limitation: The Discovery Rule.

■ In cases brought in federal courts on the basis of diversity jurisdiction, state statutes of limitation apply. *Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 196 (1st Cir.1983) (*"Fidler I"*). All of the claims advanced by the plaintiffs here have either three-year (personal injury, Mass.Gen.L. ch. 260 § 2A, breach of warranty, Mass.Gen.L. ch. 106 § 2–318) or four-year (consumer protection, Mass.Gen.L. ch. 260 § 5A) statutes of limitation.

■ Massachusetts courts apply the "discovery rule" in both negligence and products liability actions, *Fidler v. E.M. Parker Co.*, 394 Mass. 534, 544–45, 476 N.E.2d 595 (1985) (*"Fidler II"*), as well as in actions brought under the Consumer Protection Act, Mass.Gen.L. ch. 93A. *Riley v. Presnell*, 409 Mass. 239, 242–43, 565 N.E.2d 780 (1991). Under the discovery rule, the plaintiff's cause of action does not accrue until she knows or reasonably should have known that she was injured at the defendant's hands. *Fidler I*, 714 F.2d at 199, citing *Franklin v. Albert*, 381 Mass. 611, 619, 411 N.E.2d 458 (1980). The plaintiff need not have knowledge of the "full extent" of her injury for the statute to commence to run. *Olsen v. Bell Tel. Lab., Inc.*, 388 Mass. 171, 175, 445 N.E.2d 609 (1983). Moreover, once she has notice of the "likely cause" of her injury, under Massachusetts law

... the potential litigant has the duty to discover from the legal, scientific and medical communities whether the theory of causation is supportable and whether it supports a legal claim. Thus on notice, [her] cause of action is no longer inherently unknowable.

*Fidler I*, 714 F.2d at 199. Therefore, once in possession of facts sufficient to put her on notice of the likely cause of her injury, Mrs. Lareau had a "duty to discover" if she had a viable claim, and bring it within the relevant statutory limitations period. When limitations defenses are raised, the plaintiff must prove that her claims are not barred. *Franklin*, 381 Mass. at 619, 411 N.E.2d 458.

### B. Application of the Discovery Rule to Gail Lareau's claims.

■ Gail and Michael Lareau filed their claims on June 17, 1990. In order to defeat a statutory bar, those counts with three-year limitations must not have accrued earlier than June 17, 1987, and those with four-year limitations, no earlier than June 17, 1986. The defendants argue that Mrs. Lareau was put on notice of her injury and its "likely cause" in 1984, either when tests during hospitalization for the seizure revealed the mass

[Instructions to Administering Physician:] Read package insert thoroughly before using, for indications, dosage, and administration.

The package insert stated in relevant part:
CAUTION:
THIS IS A VERY DANGEROUS DRUG READ INSERT THOROUGHLY BEFORE USING THIS PRODUCT.... Any physician who administers this drug should be informed of its chronic (or long-term) toxicity, and should obtain informed consent from the patient since THOROTRAST is a very dangerous drug.... CAUTION: THOROTRAST shall be used only by and under the supervision of Certified Radiologists.... THOROTRAST is a violent tissue sclerosing agent and a natural radio-active emission material. Its half life is approximately $1.34 \times 10^{10}$ years....

WARNING:
For use only when this drug has a unique clinical usefulness, and when there is substantial evidence of limited life expectancy by reason of disease or advanced age. THOROTRAST should not be used in body cavities except in special circumstances where there are definite indications for the utilization of its unique opacification qualities. THOROTRAST should not be allowed to remain in body cavities but should be removed insofar as feasible following the procedure.
INDICATIONS:
The use of THOROTRAST is restricted to only those cases where other less hazardous techniques are inapplicable ...
ADVERSE REACTIONS:
Adverse reactions and sequelae include local granulomata, and ... neoplasm ... [as well as specific forms of cancer].

on her brain, or when she received the July, 1984 letter from Dr. Fischer warning of the "theoretical possibility" that the Thorotrast residue could develop into a tumor. The defendants contend that this information was no different from the information Mrs. Lareau received in 1989 or 1990; that the "calcified mass" first identified by Dr. Cornell was allegedly the same formation as the "thorotrast granuloma" removed from Lareau by the MGH surgeons in 1990; and that the risks associated with it were no less "theoretical" than they were when Dr. Fischer described them.

Mrs. Lareau denies that she was on notice either of the injury she had suffered or its likely cause in 1984, and argues that Dr. Fischer's letter, which mentioned only a "theoretical possibility" of tumor formation, actually served to obfuscate the fact that she had already been harmed by the defendants' actions. She contrasts Dr. Fischer's "theoretical possibility" language to the notice provided to the patient by the doctor in *Fidler I*, which the Court had pointedly described as "not neutral, ambiguous, hypothetical, or phrased in terms of mere possibility." 714 F.2d at 200. Mrs. Lareau firmly denies that either Dr. Fischer's letter or her hospital treatment informed her of any connection between the Thorotrast residue and her active medical problems, and that anybody in 1984, or in 1990 for that matter, specifically characterized the mass in her brain as a "granuloma," the term used in the medical literature to describe a formation created by residual Thorotrast. Mrs. Lareau argues that she had no notice of cognizable injury until 1989 when she became emotionally distressed by the *20/20* report and began to

suffer worsening headaches.[6] This Court disagrees.

From Dr. Fischer's July, 1984 letter, Mrs. Lareau knew that she had residual Thorotrast in her brain and that Dr. Fischer was concerned enough about the danger of its presence to recommend surgical removal. Thereafter, she continued to monitor the Thorotrast, returning to Dr. Fischer in 1985 and 1987 for CAT scans and consultations. Moreover, the physicians who finally operated on her in 1990 agreed with Dr. Fischer's appraisal when recommending surgery and there is no evidence that Dr. Fischer's avoidance of the term "granuloma" led them to confuse the issue in any way.[7]

■ The only change evidenced in the record is in Mrs. Lareau's appreciation of the risk. Nevertheless, her reluctance to credit Dr. Fischer's warning—even when reinforced by Dr. Scott's second opinion—does not toll the statutes of limitation. Even when a plaintiff is "incompetently advised" or the "medical community ... divided on the crucial issue of negligence," notice of the harm and its likely cause activates the plaintiff's duty to investigate and the cause of action accrues. *Fidler I*, 714 F.2d at 199, quoting *United States v. Kubrick*, 444 U.S. 111, 123–24, 100 S.Ct. 352, 360, 62 L.Ed.2d 259 (1979); *see also Pitts v. Aerolite SPE Corp.*, 673 F.Supp. 1123, 1128 (D.Mass.1987), *aff'd*, 841 F.2d 23 (1st Cir.1988) (even when a physician was unresponsive to the plaintiffs' causation theory, the plaintiffs were on notice and had further duty to investigate).[8] Thus, Mrs. Lareau's decision to listen to Dr. Scott instead of Dr. Fischer does not dispel the consequences of her knowledge of harm and its likely cause.[9]

6. To support her contention that no actionable harm, and thus no cause of action, existed in 1984, Mrs. Lareau looks to *Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171 (1982), in which the court held that DES daughters who had not developed vaginal cancer could not collect damages for emotional harm alone without related physical injuries. *Payton* involved no statutory bar, however, and thus does not aid the Lareaus here.

7. In fact, the record shows no evidence of a new CAT scan having been taken prior to surgery in 1990; the letter in which Dr. Pruitt refers Mrs. Lareau to Dr. Ojemann refers to the CAT scans

taken previously; neither her letter nor Dr. Ojemann's reply uses the term "granuloma."

8. Like Mrs. Lareau here, the plaintiffs in *Pitts* also claimed that they first learned of the connection between insulation material installed in their home and symptoms suffered by family members by watching *20/20*.

9. In *Fidler I*, the First Circuit suggested that a possible, if inapplicable, argument would have been that the cause of action was "inherently unknowable" until the occurrence of a scientific "breakthrough." 714 F.2d at 200. Mrs. Lareau

Application of the Massachusetts discovery rule here leads inexorably to the conclusion that Mrs. Lareau should have known about her injury as early as July, 1984. Therefore, the defendants' motions for summary judgment are granted on all claims advanced by Mrs. Lareau.

### C. Application of the discovery rule to the claims of Michael, Christopher and Ashley Lareau.

#### 1) Claims for Loss of Consortium.

■ When a spouse suffers personal injury as a result of the negligence of a third party, the other spouse may recover damages from the third party for loss of consortium. *Olsen*, 388 Mass. at 176, 445 N.E.2d 609, quoting *Diaz v. Eli Lilly & Co.*, 364 Mass. 153, 167–68, 302 N.E.2d 555 (1973). In *Ferriter v. Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 413 N.E.2d 690 (1980), the Massachusetts Supreme Judicial Court extended this cause of action to minor children who can show they are dependent on the injured parent. "This dependence must be rooted not only in economic requirements, but also in filial needs for closeness, guidance, and nurture." *Id.* at 516, 413 N.E.2d 690.

■ Although in the great majority of jurisdictions, consortium claims are derivative of the personal injury claim brought by the injured family member, in Massachusetts the rule is that they are generally independent. *Olsen*, 388 Mass. at 176–77, 445 N.E.2d 609. Massachusetts courts follow this principle of independence, for example, in refusing to reduce consortium awards in proportion to the contributory negligence of an injured spouse. *Feltch v. General Rental Co.*, 383 Mass. 603, 608, 421 N.E.2d 67 (1981); *see also Morgan v. Lalumiere*, 22 Mass.App.Ct. 262, 493 N.E.2d 206, *rev. denied*, 398 Mass. 1103, 497 N.E.2d 1096 (1986) (no reduction of consortium award even when injured spouse

was more than 50% responsible for the accident which injured her).

■ Logically, therefore, "[a]lthough a cause of action for loss of consortium in most cases would accrue at the same time as would the action for personal injuries, this may not always be true.... Since the causes of action are independent, the date of accrual of each action must be determined separately." *Olsen*, 388 Mass. at 176–77, 445 N.E.2d 609. Here, Mrs. Lareau's claim accrued upon receipt of Dr. Fischer's letter of July 6, 1984 and her complaint was not filed until well after the running of all applicable statutes of limitation. The same is not true, however, of the claims of her husband and children. Drawing all inferences in their favor as this Court is required to do when evaluating the defendants' motion for summary judgment, the claims of her husband and children did not accrue until June 16, 1989 when, after watching the *20/20* television program, Mrs. Lareau became an "emotional wreck" and her family first began to suffer the effects of the loss of her consortium. Their claims, filed in 1990, are thus comfortably within the relevant statutes of limitation. The problem—if it is a problem—is the somewhat anomalous situation that results since the loss of consortium claims all accrued well after Mrs. Lareau's own claims had been extinguished by the running of the statute of limitations. In this situation, the policy favoring the treatment of family members as individuals with separate injuries collides with the policies behind the creation of statutes of limitation—policies that grant repose to potential defendants after an appropriate period and encourage plaintiffs to bring actions before the evidence has gone stale. *Olsen*, 388 Mass. at 175, 445 N.E.2d 609. Massachusetts courts have not yet conclusively resolved this tension; the key cases in which consortium actions have fallen along with the underlying actions all feature identical accrual dates for the claims.

contends that Dr. Page claimed in his deposition that he was not aware of the dangers of Thorotrast until 1988, so that evidence of a dispute as to the state of medical knowledge on the question exists, precluding summary judgment for the defendants. This is not the thrust of the *Fidler I* dictum. Here, the articles submitted by Mrs.

Lareau herself, however, demonstrate that research had revealed the risk of tumors and other Thorotrast-related dangers as early as 1965, and based on these, the Court concludes that Dr. Fischer's recommendation was grounded in information available to the medical community in 1984.

See, e.g., *Olsen,* 388 Mass. at 177, 445 N.E.2d 609; *Gore v. Daniel O'Connell's Sons, Inc.,* 17 Mass.App.Ct. 645, 648, 461 N.E.2d 256 (1984).

### a. The husband's claim—Michael Lareau

 The defendants argue that this Court need not linger over this interesting issue since a persuasive decision in this district has already resolved the point. *See Tauriac v. Polaroid Corp.,* 716 F.Supp. 672 (D.Mass.1989) (Tauro, J.). In that case, the plaintiffs brought a claim for which no cause of action existed, and the court ruled that "a consortium claim may be brought only when the claimant's spouse has a valid tort claim." *Id.* at 673. Here, in contrast, Mrs. Lareau has a variety of valid claims which are barred by a variety of statutes of limitation. This is a very different situation. The *Tauriac* decision is persuasive, however, in its prediction that the Massachusetts Supreme Judicial Court, if faced with the issue would "refuse[ ] to extend the parameters for consortium claims." *Id.* at 674.

Undaunted, the defendants argue that the Massachusetts Supreme Judicial Court has already faced and resolved this issue in *Fidler II,* 394 Mass. at 547, 476 N.E.2d 595, favoring the policies motivating the limitation of actions over those behind the independent status of consortium claims. In that case, the plaintiff, whose product liability suit had been barred by the First Circuit decision in *Fidler I, supra,* brought her claims in the Massachusetts Superior Court. Her husband filed in the Superior Court a loss of consortium claim, a claim that had not appeared in the earlier, federal action. Justice Fine of the Superior Court statutorily barred the husband's claims along with those of his wife. The Supreme Judicial Court concurred with her disposition of the case, albeit on different grounds, ruling that the husband

was precluded from raising this consortium claim in the Superior Court where it was "pervasively related" to issues already decided in federal court. In spite of the fact that the husband had not been a party to the prior federal action, the Supreme Judicial Court considered it was vindicating the importance of the "policy of repose" which was "especially significant when the spouse of a nonprevailing litigant seeks to litigate a claim related to the spouse's alleged injuries." *Fidler II* at 547, 476 N.E.2d 595.

The *Fidler II* holding, of course, rested on the "pervasive relationship" between the wife's substantive claim and the husband's loss of consortium claim since the husband "stood on the same footing" as his wife regarding the accrual of his cause of action. The Supreme Judicial Court noted that

> [w]hen a person with a family relationship to one suffering personal injury has a claim for loss to himself resulting from the injury, the determination of issues in an action by the injured person to recover for his injuries is preclusive against the family member, **unless the judgment was based on a defense that is unavailable against the family member in the second action.**

Restatement (Second) of Judgments § 48(2), quoted in *Fidler II* at 547, 476 N.E.2d 595 (emphasis added). In affirming the dismissal of the husband's claim, the Supreme Judicial Court thus enforced policies of "judicial economy and of affording litigants repose," without abandoning the "technically independent" status of the loss of consortium claim. *Id.* at 548, 476 N.E.2d 595.

The logic of *Fidler II* is impeccable. The limitations defense to the wife's substantive claim, upheld in *Fidler I,* necessarily defeated the husband's loss of consortium claim, as a matter of logic, since the two claims accrued at the same time.[10]

10. The First Circuit, deciding a similar case four years earlier, went even further. In *Roy v. Jasper Corp.,* 666 F.2d 714, 718 (1st Cir.1981), the Court, applying New Hampshire law, precluded a wife's later filed loss of consortium claim where the husband's substantive claim had been defeated by a statute of limitations bar, commenting in dicta that spousal consortium actions are "fundamentally derivative of the first spouse's personal injury action." The First Cir-

cuit carefully distinguished its action in *Roy* from a relevant New Hampshire case which had refused to apply res judicata in dismissing a consortium action. A similar gesture would have been needed if the case had arisen under Massachusetts law. In *Diaz v. Eli Lilly & Co.,* 364 Mass. 153, 302 N.E.2d 555 (1973), the court referred to an early case establishing the separateness of a husband's consortium action from his wife's underlying claim in these terms: "thus

In the present case, however, Mrs. Lareau's claim accrued in 1984 but her husband's loss of consortium claim did not accrue until 1989. While his injury arises out of the same alleged negligence and breach of warranty, no "pervasive relationship" of circumstances exists as it did in *Fidler II*. Applying the logic used by the Restatement (Second) of Judgments to a situation in which both parties' claims are part of the same action, it becomes apparent that the defense used to bar Mrs. Lareau's claim does not work—at least not in precisely the same way—against that of her husband. Even so, the tension between the competing policies referred to above must come to resolution.

Therefore, in the somewhat unique circumstances of this case, the Court predicts that the Massachusetts Supreme Judicial Court would, if faced with the circumstances presented here, bar the husband's loss of consortium claim, and this Court so rules. This ruling is grounded on two independent approaches.

First, the Court rules that, in light of the dicta in *Fidler II* favoring the policy of repose, unless there exists some legislative mandate to the contrary, "a [spousal loss of] consortium claim may be brought only when the claimant's spouse has a valid [and enforceable] tort claim." Reworking Chief Judge Tauro's holding in *Tauriac*, 716 F.Supp. at 673. The reasoning behind this rule is found in *Olsen*, 388 Mass. at 175, 445 N.E.2d 609, which this Court paraphrases and applies to the circumstances here as follows:

> [Statutes of limitations are] vital to the welfare of society.... They promote repose by giving security and stability to human affairs. *Franklin v. Albert, supra* [381 Mass.] at [618, 411 N.E.2d 458], quoting *Wood v. Carpenter,* 101 U.S. [ (11 Otto) ] 135, 139 [25 L.Ed. 807] (1879). [They also] encourage plaintiffs to bring actions within prescribed deadlines when evidence is fresh and available. *Franklin v. Albert, supra,* citing *United States v. Kubrick,* 444 U.S. 111, [100 S.Ct. 352, 62

the fact that she has been previously defeated in her negligence action against the same defendant was irrelevant to the husband's action and could

L.Ed.2d 259] (1979). [To treat the loss of consortium claim entirely apart from the limitations period applicable to the underlying tort action] would create an unacceptable imbalance between affording plaintiffs a remedy and defendants the repose that is essential to stability in human affairs. [Treating the two independent causes of action entirely separately effectively would destroy] the fixed time period of statutes of limitations.... Under the rule proposed by [Michael Lareau], there seldom would be a prescribed and predictable period of time after which a claim would be barred.

■ Second, this Court rules as matter of law that Mrs. Lareau's failure to act on the causes of action she should have known she possessed from July, 1984 through June, 1989, when her husband's loss of consortium commenced, was an omission of care toward the marital relationship that supersedes the risks created by the negligence and breach of warranty alleged here and extinguishes the proximate cause essential to recovery upon those allegations.

Accordingly, the defendants shall have summary judgment on the claims of Mrs. Lareau's husband, Michael Lareau.

b. The daughter's claim—Ashley Lareau

■ The issues raised by the loss of consortium claims brought by the children, Christopher and Ashley Lareau, are somewhat different and deserve separate consideration. Christopher Lareau was born about a year and a half before Mrs. Lareau's cause of action accrued. Ashley Lareau was born approximately two years after the accrual date. Citing *Angelini v. OMD Corp.*, 410 Mass. 653, 575 N.E.2d 41 (1991), the defendants argue that claims for loss of consortium by children not conceived at the time of their parent's injury are disallowed, and since Mrs. Lareau was injured in 1970, well before either of the children were conceived, both childrens' claims are barred. The defendants read too much into *Angelini.*

not be used therein to support a plea of res judicata." *Id.* at 157, 302 N.E.2d 555.

In that case, the Supreme Judicial Court considered whether a child who was a non-viable fetus when his father was injured could sue for loss of parental consortium. It viewed the issue in light of Massachusetts cases allowing suit by children conceived before a parent's wrongful death, and asked why there was any need to distinguish between children born before a parent was injured and those born after:

> The answer is that, after a parent is negligently injured by a defendant, he or she may continue having children for many years. If no restriction is placed on the class of children who are eligible to recover for loss of parental consortium, a defendant may become liable for the loss of consortium several years, perhaps even decades, after the injury to the parent. As a matter of policy, however, it is important to limit the duration of the liability.

*Angelini* at 657–658, 575 N.E.2d 41.[11] Since the *Angelini* decision necessarily bars actions by children conceived after the cause of action of the parent should have been known, Ashley Lareau has no viable claim here and summary judgment shall enter for the defendants.

#### c. The son's claim—Christopher Lareau

█ The issue is not so clear regarding Christopher's claim. In *Angelini*, the parent's injury was not at any time "inherently unknowable" and the Supreme Judicial Court did not need to consider the discovery rule.

This Court, however, must face this issue. In light of the *Angelini* court's concern with the voluntary act of the parent in conceiving children post-injury, this Court rules that the Massachusetts decisions can best be harmonized by incorporating the discovery rule where applicable so that children, conceived before the parent's cause of action accrues, will be able to bring an action for loss of consortium. The *Angelini* decision, therefore, presents no obstacle to the survival of Christopher Lareau's loss of consortium claim.

█ But so what? Even if Christopher Lareau's claim is not barred by *Angelini*, at first blush it would appear to be defeated by the reasoning this Court has employed to bar Michael Lareau's claims as matter of Massachusetts common law. Not so. Under Mass. Gen.L. ch. 260, § 7, the Massachusetts legislature has expressed its policy of tolling the statutes of limitation on the claims of a minor child until he reaches the age of majority. This legislative mandate governs here. The claims of Christopher Lareau survive the bar of the statutes of limitation.

#### 2) The Remaining Claims.

What has already been said is sufficient to dispose of all the claims of Michael and Ashley Lareau and summary judgment shall enter for the defendants on all those claims due to the bar of the statutes of limitation.

The claims of Christopher Lareau survive. These are claims for loss of consortium, negligent infliction of emotional distress, and violation of Mass.Gen.L. Ch. 93A, § 9.

> While it is true that, in the absence of applicable appellate decisions, this Court is bound in a diversity case to apply Massachusetts law as consistently declared by the Massachusetts Superior Court, the "great trial court of the Commonwealth," *Irwin v. Commissioner of the Dep't of Youth Servs.*, 388 Mass. 810, 815, 448 N.E.2d 721 (1983) (Lynch, J.); *Pinnick v. Cleary*, 360 Mass. 1, 41 n. 3, 271 N.E.2d 592 (1971) (Tauro, C.J.); *McArthur Bros. Co. v. Commonwealth*, 197 Mass. 137, 139, 83 N.E. 334 (1908) (Rugg, C.J.), the reasoning in *Ullian* is fact specific to the unique properties of RHOGAM and cannot be stretched to be made applicable to this case.

---

11. The plaintiff argues that *Angelini* provides no bar to Ashley's suit, and presents a copy of a Superior Court memorandum by Justice William C. O'Neill denying a motion to dismiss the negligence and loss of consortium claims of two children conceived after their mother's doctor allegedly failed to administer RHOGAM during a previous pregnancy. *Ullian v. Cooney*, Civil No. 12–123–92 (Worcester Superior Court, Aug. 19, 1992). Relying on a case from the Indiana Court of Appeals, Justice O'Neill there noted that the injuries produced were just the sort RHOGAM was designed to prevent and were, therefore, foreseeable.

D. *Christopher Lareau's Claim for Negligent Infliction of Emotional Distress.*[12]

██ "The evolution of the tort of negligent infliction of emotional distress, as reflected in the developing case law, illustrates the difficulty courts have had in administering claims for damages based upon emotional or mental disturbance." Michelle I. Schaffer, Comment, *Tort Law—Negligent Infliction of Emotional Distress*, 78 Mass.L.Rev. 99 (1993) ("Case Comment"). The Massachusetts courts have expanded this tort from one requiring physical impact, *Spade v. Lynn & Boston R.R.*, 168 Mass. 285, 47 N.E. 88 (1897), to one requiring "physical harm ... manifested by objective symptomatology and substantiated by expert medical testimony." *Payton v. Abbott Labs*, 386 Mass. 540, 556, 437 N.E.2d 171 (1982). Recently, in *Sullivan v. Boston Gas Co.*, 414 Mass. 129, 137–38, 605 N.E.2d 805 (1993), the Supreme Judicial Court refined (some would say diluted) the *Payton* test to require simply that plaintiffs "corroborate their mental distress claims with enough objective evidence of harm to convince a judge that their claims present a sufficient likelihood of genuineness to go to trial." One commentator concludes from *Sullivan* that "it appears that medical testimony may no longer be required to substantiate the claimed distress." Michelle Schaffer, Case Comment at 101.

In view of these developments, this Court necessarily concluded that the medically diagnosed separation anxiety suffered by Christopher qualifies as compensable mental distress. Nevertheless, the Court also concluded that the injury suffered by Christopher was not, as matter of law, proximately caused by any negligence on the part of Dr. Page. While it is reasonably foreseeable that the negligent injection of Thorotrast into a seventeen year old woman could result in the eventual loss of consortium by her children, it is simply not reasonably foreseeable that, nineteen years after the injection, Christopher's mother would be subject to a hyped-up television report entitled "Sentenced to Death" and would thereby be rendered such an "emotional wreck" as would cause separation anxiety on the part of her then seven year old son.

E. *The "Learned Intermediary" Rule.*

As noted above, wholly apart from the motion for summary judgment on the ground of the statutes of limitation, the pharmaceutical companies filed on the eve of trial an additional motion for summary judgment based upon the "learned intermediary" rule. On this point, both sides primarily conjure with the same two cases—*MacDonald v. Ortho Pharmaceutical Corp.*, 394 Mass. 131, 475 N.E.2d 65 (1985) and *Garside v. Osco Drug, Inc.*, 976 F.2d 77 (1st Cir.1992) (applying Massachusetts law). Although neither case is factually apposite, the two decisions, taken together, frame the discussion as they set forth the Massachusetts law pertaining to the "learned intermediary" defense.

'[A] manufacturer may be absolved from blame because of a justified reliance upon ... a middle-man.' This exception is applicable only in the limited instances in which the manufacturer's reliance on an intermediary is reasonable. In such narrowly defined circumstances, the manufac-

---

This Court is thus free to explore the issue as set forth in the text.

**12.** The Court allowed the defendants' motion for summary judgment on this point but later, in the midst of Christopher Lareau's trial against Dr. Page, *see infra*, vacated this ruling as to Dr. Page when it became apparent that the interests of justice would be served thereby and, instead, directed a verdict in Dr. Page's favor on this point at the close of all the evidence. The Court's reasoning remains the same.

The interests of justice that impelled this move are as follows: during the charge conference in the ensuing trial, it became apparent that the loss of consortium claim covers **only** the loss to Christopher of those intangible aspects of the parental role as were allegedly damaged by Dr. Page's alleged negligence toward Mrs. Lareau. That claim does not cover the direct pain and suffering visited on Christopher due to the injury to his mother. That loss, if compensable at all, is compensated under a theory of negligent infliction of emotional distress. *See Lareau v. Page*, Civ. No. 90–11629–Y, transcript, November 5, 1993 (charge conference) and November 9, 1993 (charge) (D.Mass.1993). Since all aspects of Christopher's losses had been presented to the jury, it seemed appropriate to give him the benefit of the full trial record as to Dr. Page even though the propriety of the Court's ruling as to the other defendants rests on the summary judgment record.

turer's immunity from liability if the consumer does not receive the warning is explicable on the grounds that the intermediary's failure to warn is a superseding cause of the consumer's injury, or, alternatively, that, because it is unreasonable in such circumstances to expect the manufacturer to communicate with the consumer, the manufacturer has no duty directly to warn the consumer.

The rule in jurisdictions that have addressed the question of the extent of a manufacturer's duty to warn in cases involving prescription drugs is that the prescribing physician acts as a 'learned intermediary' between the manufacturer and the patient, and 'the duty of the ethical drug manufacturer is to warn the doctor, rather than the patient, [although] the manufacturer is directly liable to the patient for a breach of such duty.'

*MacDonald,* 394 Mass. at 135–36, 475 N.E.2d 65.[13]

Recognizing the theoretical applicability of the learned intermediary defense, and that "the common law duty [to warn] ... is to a large degree coextensive with the regulatory duties imposed by the FDA," [14] Christopher Lareau, nevertheless, argues that summary judgment is inappropriate since, first, "[w]hether a particular warning measures up ... is almost always an issue to be resolved by a jury; few questions are 'more appropriately left to a common sense lay judgment than that of whether a warning gets its message across to an average person,'" *MacDonald,* 394 Mass. at 140, 475 N.E.2d 65 quoting *Ferebee v. Chevron Chem. Co.,* 552 F.Supp. 1293, 1304 (D.D.C.1982), *aff'd,* 736 F.2d 1529, *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), and second, that the pharmaceutical companies cannot meet the complex presumption-burden shift-

ing framework found in *Garside,* 976 F.2d at 81.

Christopher's arguments fail. *Garside* is, of course, factually distinguishable since there it was undisputed that the defendant pharmaceutical company failed to warn the defendant physician. *Garside,* 976 F.2d at 81 n. 6. Here, in contrast, there is no genuine issue of material fact but that the required warnings accompanied the Thorotrast when shipped out by the manufacturer (although it is equally undisputed that Dr. Page never saw them). Despite the factual differences, however, this Court agrees, as it must, that the presumption-burden shifting framework established by the Court of Appeals must be followed here despite the fact that no Massachusetts appellate court has, as yet, explicated it in this fashion.

 Here, however, there is not the slightest competent evidence that the warnings Christopher says were unreasonable would have affected the standard of care of the average neurosurgeon practicing in the year 1970. In contrast, the *Garside* record was replete with an affidavit from a competent physician tracing the proximate cause of the injury in question to the allegedly inadequate warning. *Garside,* 976 F.2d at 79. It appears here that Christopher is looking to the videotaped deposition of John H. Heller to fill this void. Dr. Heller's qualifications are nowhere stated in the record before the Court, although it appears that he was the physician upon whom the *20/20* television report principally relied. This Court has scrutinized the record with care and, drawing all inferences in favor of Christopher, is unable to find as a premise fact, *see* Fed. R.Evid. 104(a), that Dr. Heller is competent to testify to the adequacy of warnings made to neurosurgeons in 1970. He is not himself a neurosurgeon and has never, in the course

---

13. The *MacDonald* case, while clearly establishing the learned intermediary defense under Massachusetts law, declined to follow it in a case involving oral contraceptives. *Id.* at 138–39, 475 N.E.2d 65. This Court predicts that the Supreme Judicial Court will not further limit the learned intermediary defense, especially in cases such as the Thorotrast involved here, since its use was limited to highly complex, life-threatening situations wherein the judgment and skill of the neurosurgeon are paramount. Accordingly,

the learned intermediary defense is available here, if applicable upon the undisputed facts of record.

14. It is here undisputed that the warnings accompanying the Thorotrast complied in every respect with the regulations issued by the FDA and, indeed, were expressly approved by that agency.

of his professional practice, ever dealt with the medical decisions that faced Dr. Page here. Without this testimony there is, on this record, nothing to suggest that the warnings actually made were not adequate to put the average neurosurgeon on notice of the risks involved in using Thorotrast. Since the adequacy of the warnings actually made is not here impugned, the *Garside* presumption-burden shifting mechanism does not come into play, and summary judgment must be entered for the pharmaceutical companies on this issue.

■■■■ Alternatively, analysis of another line of Massachusetts cases also supports summary judgment for the pharmaceutical companies upon the learned intermediary rule, at least upon the breach of warranty claim. In Massachusetts, a product liability breach of warranty claim is the functional equivalent of the cause of action upon strict liability found in the Restatement (Second) of Torts § 402A (1965). *Back v. Wickes Corp.*, 375 Mass. 633, 640, 378 N.E.2d 964 (1978). Under Restatement (Second) of Torts § 402A, comment k, the pharmaceutical companies could not be held strictly liable upon the undisputed facts of record here.

> According to comment k, there are some products, especially drugs, which are quite incapable of being made safe for their intended and ordinary use, and yet the marketing and use of which is justified because they may avert an otherwise inevitable death. Such a drug, properly prepared, and accompanied by proper directions and warnings, is not defective, nor is it unreasonably dangerous. The seller of such a drug [such as Thorotrast] is not to be held to strict liability for unfortunate consequences attending its use merely because he has undertaken to supply the public with the drug.

Restatement (Second) of Torts § 402A, comment k. Taking the Supreme Judicial Court at its word, this Court therefore rules that under the common law of Massachusetts as well, summary judgment as to the product liability claim must enter for the defendant pharmaceutical companies.

## F. *The Motion for a New Trial.*

■■■■ Only one of Christopher Lareau's grounds for a new trial warrants comment. He complains that the Court abused its discretion by setting and adhering to time limits for the trial of this case. The contention is without merit.

District courts may impose reasonable time limits on the presentation of evidence. *Johnson v. Ashby*, 808 F.2d 676, 678 (8th Cir.1987). We agree with the Seventh Circuit that, 'in this era of crowded district court dockets federal district judges not only may but must exercise strict control over the length of trials, and are therefore entirely within their rights in setting reasonable deadlines in advance and holding the parties to them....' *Flaminio v. Honda Motor Co.*, 733 F.2d 463, 473 (7th Cir.1984). *Borges v. Our Lady of the Sea Corp.*, 935 F.2d 436, 442–43 (1st Cir.1991).

Establishing time limits for the trial of cases is, in fact, an integral part of the Cost and Delay Reduction Plan adopted for the District of Massachusetts on November 18, 1991. Cost and Delay Reduction Plan, District of Massachusetts, Rule 5.03(a). The procedure for establishing such time limits is expressly set forth in Local Rule 43.1(a). Indeed, setting time limits for trials is a required element of the Final Pre–Trial Conference agenda in this district. Local Rule 16.5(E)(11)(c). What's more, it is generally known that most of the judges in this district do, in fact, set time limits for trials and this session in particular follows the rule. Federal Court Judicial Forum '93, 11 (MCLE, 1993). The value of pre-set time limits tailored to the trial of particular cases is becoming increasingly apparent. Agreed upon time limits are an extraordinarily valuable focusing mechanism which promote cleaner trials directed to the matters genuinely in dispute, tend to eliminate those perennial redundancies which so frustrate and madden juries, and constitute perhaps the single most valuable technique available to a trial judge for scheduling a busy trial session.

The comments of Professor Arthur Miller, Reporter for the District of Massachusetts Cost and Delay Reduction Plan, explain the

rationale for the rule and how it is expected to function:

> Time limits provide an incentive to make the best possible use of the limited time allowed for trial of the case. If the parties are not able to agree upon time limits for the trial, the court, after inviting submissions from the parties, may prescribe presumptive limits that are subject to modification for good cause shown. The parties will have an incentive to agree upon a schedule of time limits since those that the court otherwise will impose may not serve the parties' mutual interests in achieving a shorter, less expensive, and better quality trial.

> Because presumptive allotments of time probably will be stated as a total number of hours, each party will be free to allocate time as that party chooses among different uses as long as its total allotment is not exceeded. By not allocating times for particular witnesses or proceedings, the proposal avoids the increased cost and delay associated with proceedings to reallocate time whenever the presumptive allotments are not appropriate to the case.

> An explicit purpose of this provision is to create an incentive for using trial time exclusively on issues material to a disposition on the merits. The court should construe Rule 5.03 equitably and flexibly so that any party who makes proper use of time throughout the trial should be assured that an extension will be allowed if more time is needed to present all its evidence adequately.

Cost and Delay Reduction Plan, District of Massachusetts, Reporter's Comment to Rule 5.03.

These are precisely the procedures followed in this case. At the final pre-trial conference, trial counsel **themselves** agreed that the trial would take five days and the Court announced it would be holding counsel to that agreement. It was only on the morning of the first day of trial that the plaintiff's senior trial counsel (not present at the final pre-trial conference due to a conflicting trial engagement) announced that she sought more time to present her case. Thereafter, she objected in an appropriate and timely fashion to the Court's adherence to the agreed upon time limits. Moreover, senior trial counsel presented her case on behalf of Christopher Lareau in an efficient and direct manner with no wasted motion. Nevertheless, the Court would not extend the time limits earlier agreed to.

Christopher Lareau now complains that adherence to the time limits forced counsel to forego playing the videotape deposition of Dr. Joseph Heller. Counsel offers to prove that

> Dr. heller (sic) would have testified, among other things, about the history of Thorotrast. He would have described the dangers of the product and how it was generally known by the 1950's that the use of Thorotrast in man was improper. Dr. Heller would have testified about the government regulation of Thorotrast and how it came about. No other witness was qualified to testify to these matters.

Plaintiff's Memorandum In Support of His Motion For A New Trial, ¶ 4 at 6.

This Court properly exercised its discretion to adhere to time limits counsel had themselves fixed. In addition to the general considerations discussed above supportive of the Local Rule, the offer of proof claims far too much. Here, this Court has already found on the undisputed summary judgment record and pursuant to Fed.R.Evid. 104(a), that Dr. Heller was not qualified to testify that "it was generally known by the 1950's that the use of Thorotrast in man was improper," at least insofar as that testimony was sought to bear on the standard of care required to be provided by a neurosurgeon in 1970. While Dr. Heller was no doubt qualified to testify to the history and government regulation of Thorotrast, these matters were peripheral at best, and perhaps irrelevant, to the trial of this loss of consortium action. The remaining matter—the dangers of Thorotrast—was amply covered by the plaintiff's trial expert, an eminent professor of neurosurgery. Even though Dr. Heller was qualified to testify on the matter, his testimony would have been cumulative. Accordingly, the time limit upheld here fell well within the "wide latitude" accorded a district court in the management of its caseload. *United*

States v. Cassiere, 4 F.3d 1006, 1017 (1st Cir.1993); United States v. Tracy, 989 F.2d 1279, 1285 (1st Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 2393, 124 L.Ed.2d 294 (1993); United States v. Sutton, 970 F.2d 1001, 1005 (1st Cir.1992); Borges v. Our Lady of the Sea Corp., supra, at 441.

### III. CONCLUSION

For all the foregoing reasons, judgment properly entered for the defendants upon the plaintiffs' claims. Christopher Lareau's motion for a new trial is denied.