JEREMY MICHAEL ANGELINI[1] *vs.* OMD CORPORATION[2]
& another.[3]

Bristol. January 10, 1991. - July 15, 1991.

Present: LIACOS, C.J., WILKINS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Parent and Child,* Companionship and society, Consortium. *Actionable Tort. Infant. Legitimacy. Negligence,* Causing loss of consortium, Causing loss of parental society.

A child who was conceived before his father suffered non-fatal injuries allegedly caused by the negligence of a third person, and who was subsequently born alive, was not as matter of law precluded from recovering for loss of parental society (consortium). [655-662]

In a child's action for loss of parental consortium arising from injuries allegedly caused by the negligence of a third person, the summary judgment record did not establish that the plaintiff lacked the economic and emotional ties to his father that would permit recovery; moreover, in further proceedings, the plaintiff's illegitimacy was to play no role in determining whether he was entitled to recover. [662-663]

CIVIL ACTION commenced in the Superior Court Department on December 10, 1985.

The case was heard by *William H. Carey,* J., on motions for partial summary judgment, and entry of separate and final judgment was ordered by *John M. Xifaras,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*Alan A. Amaral* for the plaintiff.

*David R. DiCicco & John J. Harrington (Joseph M. O'Neil* with them) for the defendants.

---

[1] By his mother and next friend, Susan Beth Angelini.

[2] Doing business as B.B. Binks.

[3] Hoy Tin Restaurant, Inc.

LIACOS, C.J. This case presents the question whether a child may recover for loss of consortium arising from injuries negligently inflicted on a parent by a third party if, at the time of injury, the child was a nonviable fetus. The plaintiff Jeremy Michael Angelini was en ventre sa mere at the time his father Leo LePage was injured on September 29, 1985. On that day, an automobile driven by Mark W. Laberge, in which Leo was a passenger, hit a light pole. As a result of the accident, Leo, Shawn Lewis (another passenger in the automobile), and Jeremy[4] brought a twelve-count complaint naming Mark Laberge, OMD Corporation (OMD) (doing business as B. B. Binks) and Hoy Tin Restaurant, Inc. (Hoy Tin), as defendants. B.B. Binks and Hoy Tin are restaurants in Swansea.

The complaint alleged that Laberge operated the automobile in a negligent manner. The complaint also alleged that OMD and Hoy Tin negligently served alcoholic beverages to Laberge shortly before the accident and violated the dram shop act. G. L. c. 138, § 69 (1988 ed.). In addition, counts XI and XII of the complaint alleged that Leo "was an able bodied man who had worked regularly and had properly cared for the woman who was carrying his child and had made plans for supporting his minor child" and that "[a]s a direct and proximate result of the actions" of OMD and Hoy Tin, the child, who had not been born at the time the complaint was filed, "has been and will be in the future deprived of the regular and reasonable support, maintenance and comfort that [he] would have received but for the accident." OMD and Hoy Tin filed separate motions for summary judgment on counts XI and XII. In memoranda of law in support of the motions, both defendants argued that, since Jeremy was a nonviable fetus at the time of the injury to Leo, Jeremy could not as matter of law maintain an action for loss of consortium. The judge granted the motions for summary judgment. A motion for entry of separate and final judgment

---

[4]Jeremy's mother, Susan Beth Angelini, was not in the automobile at the time of the accident.

was subsequently allowed, and Jeremy appealed. We granted the plaintiff's. application for direct appellate review. We reverse.

A motion for summary judgment should be allowed "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Mass. R. Civ. P. 56(c), 365 Mass. 824 (1974). "[T]he moving party must affirmatively show that there is no real issue of fact, . . . all doubts being resolved against the party moving for summary judgment" (citations omitted). *Shawmut Worcester County Bank, N.A.* v. *Miller*, 398 Mass. 273, 281 (1986).

In *Diaz* v. *Eli Lilly & Co.*, 364 Mass. 153, 167-168 (1973), we held that a "spouse has a claim for loss of consortium shown to arise from personal injury of the other spouse caused by negligence of a third person." In *Ferriter* v. *Daniel O'Connell's Sons, Inc.*, 381 Mass. 507 (1980), we were faced with the question whether a child could recover for loss of a parent's companionship and society due to injuries negligently inflicted on the parent by a third party. We stated in *Ferriter* that "[w]e are skeptical of any suggestion that a child's interest [in a parent's society] is less intense" than the interest of a spouse in the companionship of the other spouse. *Id.* at 510. We proceeded to hold that "children have a viable claim for loss of parental society if they can show that they are minors dependent on the [injured] parent . . . . This dependence must be rooted not only in economic requirements, but also in filial needs for closeness, guidance, and nurture." *Id.* at 516.

The Appeals Court has on two occasions elaborated on our holding in *Ferriter*. In *Glicklich* v. *Spievack*, 16 Mass. App. Ct. 488, 496 (1983), the court stated that "[i]t is clear from *Ferriter* that the injured parent need not be the principal wage earner in order for the child to recover for loss of parental society. It is sufficient if the child is living in the injured parent's household and is dependent on the parent for

management of the child's needs and for emotional guidance and support." The court in *Glicklich* concluded that there was sufficient evidence for the nine year old plaintiff to recover for parental society since the child lived with the injured parent, and the latter "prepared [his] meals, discussed his day with him, read him stories and generally took an interest in his play, school and friends." *Id.* Three years later, in *Morgan* v. *Lalumiere*, 22 Mass. App. Ct. 262, 270 (1986), the court held that a dependent "who is not a minor but who is a handicapped person who resides in the household of his wrongfully injured mother and who is dependent upon her physically, emotionally, and financially" may recover for loss of parental consortium.

This court has recognized, however, that, as a matter of policy there must be limits to the types of relationships from which an action for loss of consortium can arise. In *Feliciano* v. *Rosemar Silver Co.*, 401 Mass. 141 (1987), the plaintiff had lived for over twenty years with the individual who was allegedly injured by the defendant. The couple was not legally married, but they held themselves out as husband and wife, had joint savings accounts, jointly owned their home, and depended on each other for comfort, love, and guidance. *Id.* at 142. In the absence of a legal marriage, we refused to allow recovery for loss of consortium. We stated that "[d]istinguishing between the marriage relationship and the myriad relationships that may exist between mere cohabitants serves the purpose of limiting protection to interests and values that are reasonably ascertainable." *Id.* Similarly, in *Mendoza* v. *B.L.H. Electronics*, 403 Mass. 437, 439 (1988), we held that an adult stepchild may not recover for loss of parental consortium from a defendant who negligently injured his stepparent. We stated that the plaintiff in *Mendoza* lacked "both the legal relationship to the injured party regarded as essential in *Feliciano*, and the unique and intense dependency recognized in [*Morgan, supra*] as giving

rise to the right of recovery by a mentally and physically disabled adult child."[5]

Jeremy argues that the fact that he was not a viable fetus at the time of Leo's injury should not as matter of law preclude him from recovering for loss of parental consortium. He contends that, since he was conceived before Leo was injured, and was born alive, he should be allowed to recover for loss of parental consortium. The defendants argue that to include nonviable fetuses within the class of children who may recover for loss of parental consortium would be an unwarranted expansion of the *Ferriter* doctrine. The defendants urge us to limit recovery to those children who were born before the injury to the parent or, at the very least, to those children who at the time of the injury were viable fetuses.

As a threshold issue, we must determine first whether, as matter of law, there should be *any* restriction placed on the class of children eligible to recover for loss of parental consortium. Should, for example, children who were conceived after the parent was injured be allowed to recover for loss of parental consortium? It can be argued convincingly that a child's loss of parental consortium is not affected by the time of injury to the parent. A child conceived after the injury, and eventually born alive, may suffer the same loss of parental consortium as a child conceived before the injury and also born alive. It may be asked, therefore, why should the latter be allowed to recover for loss of consortium and not the former? The answer is that, after a parent is negligently injured

---

[5]In *Norman* v. *Massachusetts Bay Transp. Auth.*, 403 Mass. 303, 306 (1989), we stated that parents could not recover for the loss of consortium of their children because parents ordinarily do not "*depend* on a child's companionship, love, support, guidance, and nurture in the same way and to the same degree that a husband depends on his wife, a wife depends on her husband, or a minor or disabled adult depends on his or her parent" (emphasis in original). The Legislature subsequently enacted G. L. c. 231, § 85X (1990 ed.), which provides as follows: "The parents of a minor child or an adult child who is dependent on his parents for support shall have a cause of action for loss of consortium of the child who has been seriously injured against any person who is legally responsible for causing such injury." See *Liebovich* v. *Antonellis, ante* 568 (1991).

by a defendant, he or she may continue having children for many years. If no restriction is placed on the class of children who are eligible to recover for loss of parental consortium, a defendant may become liable for the loss of consortium several years, perhaps even decades, after the injury to the parent. As a matter of policy, however, it is important to limit the duration of the liability. See *Klein* v. *Catalano*, 386 Mass. 701, 709 (1982). Cf. *Feliciano, supra*.[6]

Having determined that there must be some restriction placed on the class of children who may recover for loss of parental consortium, we must next determine the nature of the limitation.[7] The parties in the present case address the question whether viability of the fetus at the time of injury to the parent should be the dispositive issue. We begin our analysis with that question.

In deciding whether to apply a "viability at the time of injury" test we seek guidance from the line of prenatal injury cases which discuss the significance of a fetus's viability in actions for wrongful death. The first reported case in the nation dealing with the tortious injury of a fetus was *Dietrich* v. *Northampton*, 138 Mass. 14 (1884). The court held that a duty of care is not owed to a fetus, and that a fetus was not a "person" within the meaning of the wrongful death statute, the predecessor to G. L. c. 229, § 2 (1988 ed.). *Dietrich* v. *Northampton, supra* at 17. The rule announced in *Dietrich*

---

[6] "The claim for loss of consortium is independent of the claim of the injured [party]. *Feltch* v. *General Rental Co.*, 383 Mass. 603, 606 (1981). Although a cause of action for loss of consortium in most cases would accrue [for purposes of the statute of limitations, G. L. c. 260, § 2A (1990 ed.)] at the same time as would the action for personal injuries, this may not always be true. Cf. *Diaz* v. *Eli Lilly & Co.*, [364 Mass. 153, 167 (1973)]. Since the causes of action are independent, the date of accrual of each action must be determined separately." *Olsen* v. *Bell Tel. Laboratories, Inc.*, 388 Mass. 171, 176-177 (1983). The cause of action in a parental consortium case cannot accrue until the child is born because the loss of consortium cannot occur until the child is born. The statute of limitations, therefore, will not automatically bar actions for loss of parental consortium brought more than three years after the parent is injured.

[7] To our knowledge, there are no reported cases from any jurisdiction on the issue.

prohibiting recovery for prenatal injuries remained the law in the Commonwealth until *Keyes* v. *Construction Serv., Inc.,* 340 Mass. 633 (1960).

In *Keyes,* we held that the administrator of the estate of the deceased child could recover for wrongful death if the child was a viable fetus at the time of the injury, and was born alive. *Id.* at 637.[8] Seven years later, however, in *Torigian* v. *Watertown News Co.,* 352 Mass. 446, 448 (1967), we rejected the *Keyes* rule that a fetus had to be viable at the time of injury, and held that a fetus which was not viable at the time of injury but which was born alive was a "person" under the wrongful death statute. We noted that the vast majority of cases allowed recovery and that "[t]he grounds which have been most frequently urged against allowing recovery are . . . the avoidance of speculation or conjecture, and the encouragement of fictitious claims. . . . The advancement of medical science should take care of most of these arguments. The element of speculation is not present to any greater extent than in the usual tort claim where medical evidence is offered and the issue of causation must be weighed with great care. . . . The opportunity for fraudulent claims can be faced by the courts as in other types of cases." (Citations omitted.) *Id.* at 448-449.

After *Torigian* the dispositive issue in wrongful death cases involving prenatal injuries to the child appeared to be whether the child was born alive, and not whether the fetus was viable at the time of injury. This was reaffirmed in *Leccesse* v. *McDonough,* 361 Mass. 64, 67 (1972), where the court held that a stillborn infant was not a "person" under

---

[8]The *Keyes* court was convinced by the argument that "whenever a child in utero is so far advanced in prenatal age as that, should parturition by natural or artificial means occur at such age, such child could and would live separable from the mother and grow into the ordinary activities of life, and is afterwards born and becomes a living human being, such child has a right of action for any injuries wantonly or negligently inflicted upon his or her person at such age of viability, though then in the womb of the mother." *Id.* at 636, quoting *Allaire* v. *St. Luke's Hosp.,* 184 Ill. 359, 374 (1900) (Boggs, J., dissenting), majority opinion overruled by *Amann* v. *Faidy,* 415 Ill. 415, 432 (1953).

the wrongful death statute even if the fetus was viable at the time of injury. *Leccesse*, however, was overruled by *Mone* v. *Greyhound Lines, Inc.*, 368 Mass. 354 (1975). We pointed out in *Mone* that the "live birth rule" did not allow recovery if the trauma to the fetus was serious enough to be fatal, but it did allow recovery for less serious traumas from which the fetus survived. *Id.* at 361. We concluded that the administrator of an estate of a stillborn infant could recover under the wrongful death statute as long as the fetus was viable at the time of the injury. *Id.*

*Mone* applied a "viability rule" in cases of prenatal injury where the infant was stillborn. *Mone* did not discuss cases where the infant was born alive and the injury occurred while the fetus was not viable. *Mone*, in other words, while overruling *Leccesse*, did not disturb the holding in *Torigian*. See *Mone* v. *Greyhound Lines Inc.*, *supra* at 366 (Braucher, J., dissenting). The case law suggests, therefore, that, if a fetus is injured while it is nonviable, a cause of action will lie under the wrongful death statute if the fetus continues to develop and is eventually born alive. *Torigian, supra.* Cf. *Payton* v. *Abbott Labs*, 386 Mass. 540, 564 (1982) (plaintiffs who were fetuses at time their mothers ingested harmful drug believed to prevent miscarriages have cause of action against manufacturers of drug).[9]

The present case differs from the above-mentioned cases because the injury alleged here, namely the loss by Jeremy of his father's parental society, could occur only after Jeremy

---

[9]In cases involving prenatal injuries, an increasing number of courts across the country have rejected the requirement that a fetus be viable at the time it was injured provided that the child was later born alive. See cases cited in 3 F. Harper, F. James & O. Gray, Torts § 18.3, at 678 n.16 (1986). In addition, "[c]ommentators seem to be virtually united in rejecting the requirement of viability at the time of injury at least where the child is later born alive." *Id.*

In *Commonwealth* v. *Cass*, 392 Mass. 799, 807 (1984), we held that a viable fetus is a "person" within the meaning of the vehicular homicide statute. G. L. c. 90, § 24G (b) (1988 ed.). In *Cass*, we refused to express a view whether it is homicide to cause the death of a nonviable fetus. *Id.* at 807 n.8.

was born. If the viability of the fetus is not dispositive in cases of prenatal injury when the infant is born alive, then viability should not be dispositive in cases, such as the present one, where the alleged injury occurred *after* birth. The time in which the fetus became viable has no connection with the injury allegedly suffered by the child. Thus, viability of the fetus at the time of injury to the parent should not be the dispositive issue in separating those children who may recover for loss of consortium from those who may not.

While viability is not dispositive in a wrongful death claim involving a prenatal injury when the child is subsequently born alive, *Torigian, supra,* the wrongful death statute necessarily subsumes that a child who seeks to recover for the wrongful death of a parent was conceived prior to the wrongful death of its parent. The children of the deceased are persons entitled to recover for the loss of society and companionship which results from the wrongful death. See G. L. c. 229, §§ 1 & 2. As a result, if an individual conceives a child, and the child is born after the individual's wrongful death, the child will be allowed to recover since the deceased parent was survived by the child. See *id.*

If a child may recover for the wrongful death of a parent, it would be anomalous to deny recovery for loss of parental consortium to a child who was conceived before the parent was seriously (but not fatally) injured. "There should be a consistency between our statutory law and our case law." *Liebovich* v. *Antonellis, ante* 568, 578 (1991), quoting *Norman* v. *Massachusetts Bay Transp. Auth.,* 403 Mass. 303, 311 (1988) (Liacos, J., dissenting). See *Ferriter* v. *Daniel O'Connell's Sons, Inc.,* 381 Mass. 507, 515-516 (1980). We see no reason why a child who was conceived before his or her parent was injured, and who was later born alive, should be allowed to recover for loss of parental consortium only if the parent *died* as a result of the injuries. We therefore hold that a child who was (1) conceived *before* his or her parent suffered non-fatal injuries caused by the negligence of a de-

fendant, and (2) subsequently born alive, is not as matter of law precluded from recovering for loss of parental consortium.

Additionally, the child must, in order to recover for loss of parental consortium, establish a reasonable expectancy of a dependent relationship with the injured parent. See *Ferriter*, *supra* at 516. We cannot conclude, based on the record before us, that Jeremy lacked a reasonable expectancy of the necessary economic and emotional ties with Leo, which would allow him to recover for loss of parental consortium as a result of the injuries suffered by Leo. We believe that there are material facts in dispute regarding the issue whether Jeremy had a reasonable expectancy of such dependency.[10]

The defendants make one other argument which we think should be addressed. It is undisputed that the plaintiff's mother and father were never married to each other. The defendants, citing *Feliciano, supra*, argue that Jeremy's illegitimacy, while not dispositive, is an important factor in determining whether he should be allowed to recover for loss of parental consortium since "[illegitimacy] derogates from the values of a viable family unit, values which are at the heart of a recognition of consortium damages." It is clear, however, that Jeremy and Leo, unlike the unmarried couple in *Feliciano*, have a relationship which is recognized by the law. See G. L. c. 209C, § 1 (1990 ed.) ("[c]hildren born to parents who are not married to each other shall be entitled to the same rights and protections of the law as all other children"). The traditional common law rules which discriminated against children born out of wedlock have been discarded. The trend of the law has been to treat illegitimate children in the same way as legitimate children. See *C.C. v.*

---

[10]The record includes affidavits from the defendants' attorneys which state that Leo, after the accident, sired a child with a woman other than Susan. The defendants argue that this is further evidence that Leo did not provide Jeremy with emotional guidance, support, or nurture. We do not agree. The fact that Leo had a child with another woman is not conclusive of the question whether Jeremy had a reasonable expectancy of economic and emotional dependency on Leo.

*A.B.*, 406 Mass. 679, 684-685 (1990); *Powers* v. *Wilkinson*, 399 Mass. 650, 661 (1987); *Doe* v. *Roe*, 23 Mass. App. Ct. 590, 592-593 (1987). We have recognized that placing additional burdens on illegitimate children is unfair because they are not responsible for their illegitimacy. See *Powers* v. *Wilkinson, supra* at 661, quoting *Weber* v. *Aetna Casualty & Sur. Co.*, 406 U.S. 164, 175 (1972). We believe that a child plaintiff's legitimacy status should not play any role in determining whether the child may recover for loss of parental consortium. See *Levy* v. *Louisiana*, 391 U.S. 68, 71-72 (1968) (wrongful death statute interpreted by State court as denying recovery to illegitimate children violates equal protection).

*Conclusion.* Since Jeremy was conceived before Leo was injured, and Jeremy was subsequently born alive, he should not be precluded as matter of law from recovering for loss of parental consortium. We cannot conclude from this record that there were no material facts in dispute regarding the issue whether Jeremy had a reasonable expectation of such dependency. The summary judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*