# IN THE SUPREME COURT OF IOWA

No. 14–1547

Filed May 6, 2016

Amended August 23, 2016

**ESTATE OF PAUL DEDRICK GRAY by BRENNA MARIE GRAY,** Administrator of the Estate, and **BRENNA MARIE GRAY,** Individually and on Behalf of O.D.G., Minor Child of Paul Dedrick Gray and Brenna Marie Gray,

Appellants,

vs.

**DANIEL J. BALDI; DANIEL J. BALDI, D.O., P.C.; UNITED ANESTHESIA & PAIN CONTROL, P.C.; CENTRAL IOWA HOSPITAL CORPORATION; IOWA HEALTH PAIN MANAGEMENT CLINIC; IOWA HEALTH SYSTEM; UNITYPOINT HEALTH; BROADLAWNS MEDICAL CENTER FOUNDATION;** and **BROADLAWNS MEDICAL CENTER,**

Appellees.

---

Appeal from the Iowa District Court for Polk County, Dennis J. Stovall, Judge.

Plaintiffs appeal from a district court decision granting summary judgment to defendant medical providers, contending the district court erred in concluding the plaintiffs' wrongful-death and loss-of-consortium claims are time-barred. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Bruce H. Stoltze of Stoltze & Updegraff, P.L.C., Des Moines, for appellants.

2

Eric G. Hoch, Connie L. Diekema, and Erik P. Bergeland of Finley, Alt, Smith, Scharnberg, Craig, Hilmes & Gaffney, P.C., Des Moines, for appellees Daniel J. Baldi; Daniel J. Baldi, D.O., P.C.; United Anesthesia & Pain Control, P.C.; Broadlawns Medical Center Foundation; and Broadlawns Medical Center.

Barry G. Vermeer, Loree A. Nelson, and Sarah K. Grotha of Gislason & Hunter LLP, Des Moines, for appellees Central Iowa Hospital Corporation, Iowa Health System, and UnityPoint Health.

**HECHT, Justice.**

In this wrongful-death case, Paul Gray's surviving spouse and daughter allege Dr. Daniel Baldi and several Iowa healthcare providers negligently treated Paul during his struggle with substance abuse. The district court concluded the plaintiffs brought suit after the applicable statutes of limitations expired and granted summary judgment in favor of the defendants. On appeal, we conclude the district court's ruling was partially erroneous. We hold a child conceived but not yet born at the time of their parent's death can bring a parental consortium claim after the child is born. However, we do not decide whether the discovery rule can extend the time to file wrongful-death claims under Iowa Code section 614.1(9)(*a*) (2009), because we conclude even if it can, the wrongful-death and spousal consortium claims were untimely under the circumstances presented here. Accordingly, we affirm the district court's summary judgment ruling in part, reverse it in part, and remand for further proceedings.

## I. Background Facts and Proceedings.

In December 2005, Paul Gray began receiving care from Dr. Baldi, an addiction medicine and pain management specialist. Dr. Baldi knew Paul struggled with substance abuse, and his treatment of Paul involved examinations, diagnoses, and prescriptions of various medications. Paul's wife, Brenna Gray, often attended appointments with Paul and communicated with Dr. Baldi regarding his treatment.

On May 24, 2010, Paul passed away. For purposes of this appeal, the parties agree Paul died from an overdose or lethal combination of medications. However, the record does not reveal specifically which medication or medications caused or contributed to the death, nor does

it establish whether Dr. Baldi prescribed them.[1] Brenna was pregnant at the time of Paul's death and gave birth to a daughter, O.D.G., several months later. Brenna was subsequently appointed administrator of Paul's estate.

On February 14, 2014, Brenna filed a wrongful-death lawsuit against Dr. Baldi, United Anesthesia and Pain Control, Central Iowa Hospital Corporation, Iowa Health Pain Management Clinic, Iowa Health System, UnityPoint Health, Broadlawns Medical Center, and Broadlawns Medical Center Foundation (collectively Baldi). The petition alleged Baldi breached the standard of care in prescribing, managing, and dispensing medications for Paul, and negligently failed to supervise or monitor Paul's progress. The petition listed three plaintiffs asserting three different claims: Paul's estate asserting wrongful death, Brenna asserting a loss of spousal consortium, and O.D.G. asserting a loss of parental consortium (collectively Gray).

Baldi filed an answer and a simultaneous motion for summary judgment, contending each of Gray's claims was time-barred. The wrongful-death and spousal consortium claims, Baldi asserted, were filed more than two years after May 24, 2010—the date "on which the claimant knew, or through the use of reasonable diligence should have known" of Paul's death. Iowa Code § 614.1(9)(*a*); *see Schultze v.*

---

[1]The record does not include a copy of Paul's medical records, death certificate, or autopsy report. The record also does not include any information about the scene of Paul's death. Because Paul was a member of the band Slipknot, his death received considerable media attention. Thus, additional information about his death may appear in news reports. However, such reports are outside the record and we therefore cannot consider them. *Graham v. Kuker*, 246 N.W.2d 290, 292 (Iowa 1976) (disregarding "statements of purported fact . . . which are outside the record"); *Barnes v. Century Sav. Bank*, 149 Iowa 367, 381, 128 N.W. 541, 547 (1910) (declining to consider asserted facts "which may be true . . . , but which do not appear in the printed record").

*Landmark Hotel Corp.*, 463 N.W.2d 47, 49 (Iowa 1990) ("[M]alpractice actions for wrongful death must be brought within two years after the claimant knew of the death."). Furthermore, Baldi asserted O.D.G.'s parental consortium claim was untimely because it too was filed more than two years after Paul's death and O.D.G. was ineligible for the tolling provision in Iowa Code section 614.1(9)(*b*). *See* Iowa Code § 614.1(9)(*b*) (providing actions arising out of medical care and "brought on behalf of a minor who was under the age of eight years when the act, omission, or occurrence alleged in the action occurred shall be commenced no later than the minor's tenth birthday"). Baldi contended O.D.G. was not a "minor" at the time of Paul's death, and she was therefore ineligible for protection under the statute.

In resisting Baldi's motion for summary judgment, Gray asserted our decision in *Rathje v. Mercy Hospital*, 745 N.W.2d 443 (Iowa 2008), significantly changed the analytical framework of the discovery rule under section 614.1(9). In *Rathje*, we concluded "our legislature intended the medical malpractice statute of limitations to commence upon actual or imputed knowledge of both the injury *and* its cause in fact." *Id.* at 461 (emphasis added). Gray supported the resistance to the motion with Brenna's affidavit stating that to the best of her "knowledge, recollection, understanding[,] and belief," she did not discover Baldi might have caused or contributed to Paul's death until less than two years before the petition was filed. Gray contended summary judgment was therefore inappropriate because the claims for wrongful death and loss of spousal consortium were timely under the discovery rule explicated in *Rathje*.

Baldi presented a twofold response. First, he asserted the holding in *Rathje* controls the discovery rule analysis in injury—but not death—

cases. This distinction is significant, Baldi contended, because this court previously noted differences between wrongful-death claims and claims for nonfatal injuries. *See Schultze*, 463 N.W.2d at 50 ("[T]he fact that a death has occurred provides the plaintiff with the starting point to determine whether a valid cause of action for wrongful death exists."). Second, Baldi asserted, even if the discovery rule announced in *Rathje* is applied in this wrongful-death case, summary judgment should be granted because as a matter of law Gray knew or should have known of a causal connection between Paul's death and Baldi's care before February 14, 2012. *Cf. Swartzendruber v. Schimmel*, 613 N.W.2d 646, 651 (Iowa 2000) (applying the discovery rule in a workers' compensation case but nonetheless finding the claim untimely as a matter of law). Specifically, Baldi (the collective defendants) contended Brenna's sworn deposition and trial testimony during a criminal prosecution the state filed against Dr. Baldi (the individual) established two propositions justifying summary judgment: first, Brenna harbored concerns about Paul's consumption of prescription medications and Baldi's treatment even before the date of Paul's death; and second, Brenna knew in January 2012 that Baldi's treatment may have been connected with Paul's death because she met at that time with a state investigator developing an administrative case against Dr. Baldi.

The district court granted the motion for summary judgment in its entirety. Gray appealed the summary judgment ruling and we retained the appeal.

## II. Scope of Review.

"We review a district court ruling granting a motion for summary judgment for correction of errors at law." *Rathje*, 745 N.W.2d at 447. "We . . . view the record in the light most favorable to the nonmoving

party and will grant that party all reasonable inferences that can be drawn from the record." *Cawthorn v. Catholic Health Initiatives Iowa Corp.*, 806 N.W.2d 282, 286 (Iowa 2011).

### III. The Parties' Positions.

**A. Gray.** Gray acknowledges our decision in *Schultze* is a major obstacle for the wrongful-death and spousal consortium claims. *See Schultze*, 463 N.W.2d at 49 (concluding section 614.1(9) "communicates that malpractice actions for wrongful death must be brought within two years after the claimant knew of the death"). However, Gray points out our intervening decision in *Rathje* "departs from the direction we have taken in our prior cases" concerning nonfatal medical injuries and applies the discovery rule to toll the limitations period until the plaintiff knows or should know the physical harm *and* its factual cause. *Rathje*, 745 N.W.2d at 463. Therefore, according to Gray, our analysis in *Schultze* has been undermined and we should apply the *Rathje* rationale uniformly to both wrongful-death claims and nonfatal injuries. If we do not, Gray contends, the disparate treatment of wrongful-death and nonfatal injury claims violates equal protection.

On the second issue, Gray asserts O.D.G.'s loss-of-consortium claim was timely filed because a fetus in utero is under the age of eight and the principle limiting the universe of persons protected under section 614.1(9)(*b*) is simply that a fetus must have been conceived before their parent's death and eventually be born. A contrary interpretation, Gray asserts, denies equal protection of law because it would permit a child who was just seconds old at the time of their parent's death to sue, yet prevent the same suit from a child who was born a second after their parent passed away.

**B. Baldi.** Baldi urges us to follow *Schultze* and maintain a strict two-year limitations period that commences without exception on the date of death for wrongful-death claims arising out of patient care. In Baldi's view, *Rathje* limits the benefit of the discovery rule to cases asserting nonfatal injuries and is therefore of no aid to Gray in this wrongful-death case.[2]

Baldi further contends the district court correctly granted summary judgment in the defendants' favor on O.D.G.'s claim because the time for filing children's consortium claims is extended under section 614.1(9)(*b*) only for children who are born before the wrongful death of, or the nonfatal injury sustained by, their parent. Because O.D.G. was in utero when Paul died, Baldi insists she was not a "minor" protected by the statute and her claim is time-barred. But in any event, Baldi asserts, O.D.G.'s claim fails because until O.D.G. was born, she had no cognizable consortium interest with Paul to lose. *See Doe v. Cherwitz*, 518 N.W.2d 362, 365 (Iowa 1994) (concluding children neither born nor conceived at the time their parent was allegedly injured have no cognizable parental consortium claim).

**IV. Analysis.**

The district court granted summary judgment in Baldi's favor on each of Gray's claims. The respective claims involve different limitations

---

[2]Baldi also emphasizes that in *Lightfoot v. Catholic Health Initiatives*, we denied further review after the court of appeals addressed a similar statute-of-limitations question in a wrongful-death case and considered *Schultze* controlling even after *Rathje*. *See Lightfoot v. Catholic Health Initiatives*, No. 12–0319, 2013 WL 1452932, at *2 (Iowa Ct. App. Apr. 10, 2013). Emphasis on the denial of further review in *Lightfoot* is misplaced. Denials of further review are analogous to Supreme Court denials of certiorari, and it is well beyond dispute that "denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times." *United States v. Carver*, 260 U.S. 482, 490, 43 S. Ct. 181, 182, 67 L. Ed. 361, 364 (1923).

periods. The timeliness of the wrongful-death and spousal consortium claims turns on section 614.1(9)(*a*), which governs actions "founded on injuries to the person or wrongful death . . . arising out of patient care." Iowa Code § 614.1(9)(*a*). The statute provides that a person asserting this type of claim must file it "within two years after the date on which the claimant knew, or through the use of reasonable diligence should have known, or received notice in writing of the existence of, the injury or death." *Id.*

By contrast, an action otherwise brought under section 614.1(9)(*a*), but that is "brought on behalf of a minor who was under the age of eight years when the act, omission, or occurrence alleged in the action occurred" must be filed "no later than the minor's tenth birthday or as provided in paragraph 'a', whichever is later." *Id.* § 614.1(9)(*b*). This statute governs O.D.G.'s parental consortium claim. *See Christy v. Miulli*, 692 N.W.2d 694, 704–05 (Iowa 2005).

**A. Section 614.1(9)(*b*) and Unborn Children.** We first address O.D.G.'s parental consortium claim. Baldi asserts the plain language of section 614.1(9)(*b*) forecloses O.D.G.'s claim because O.D.G. is not "a minor who was under the age of eight years when the act, omission, or occurrence alleged in the action occurred." Iowa Code § 614.1(9)(*b*). Baldi insists a fetus is not a "minor" for purposes of the statute because the word "minor" includes only living persons and an unborn child is not yet living. This question "whether a . . . fetus on the date of the accident is a child for purposes of asserting a parental consortium claim" has been presented to our court before. *Roquet v. Jervis B. Webb Co.*, 436 N.W.2d 46, 47 (Iowa 1989). However, we did not answer the question in *Roquet* because we resolved that case on another ground. *See id.* at 49.

Addressing the merits of the question today, we conclude the statutory language is not as plain as Baldi asserts. In fact, "[t]he semantic argument whether an unborn child is a 'person in being' [is] beside the point." *Smith v. Brennan*, 157 A.2d 497, 503 (N.J. 1960). Section 614.1(9)(*b*) addresses "[a]n action subject to paragraph '*a*'"—that is, an action arising out of patient care—"and brought on behalf of a minor." Iowa Code § 614.1(9)(*b*). The phrase "brought on behalf of a minor" modifies "an action" and clearly addresses the child's age at the time the case is commenced. *See id.* In other words, the statute's initial focus is in the present tense on the filing of the action, not on whether the minor child on whose behalf the claim is brought was alive at some prior time. Gray filed the petition when O.D.G. was less than four years old. Thus, the action was clearly "brought on behalf of a minor." *See id.*

Section 614.1(9)(*b*) also includes a past-tense component, as it pivots to consider whether the minor *was* under the age of eight at the time of the occurrence for which the action is brought *Id.* Our precedents have never addressed the precise factual scenario presented here, where a child's parent died after the child was conceived and still in utero, but the child born later manifested no physical injury arising from the tortfeasor's acts or omissions. Instead, our cases have only addressed factual scenarios in which tortfeasors caused physical harm to fetuses in utero. *See Dunn v. Rose Way, Inc.*, 333 N.W.2d 830, 833 (Iowa 1983) (recognizing a parent's claim for loss of consortium with an unborn child because the category of minor children "certainly includes unborn persons"); *McKillip v. Zimmerman*, 191 N.W.2d 706, 709 (Iowa 1971) (concluding a stillborn fetus has no cause of action for wrongful death because " 'person' as used in [the survival statute] means only those born alive"). We conclude the distinction between *Dunn* and *McKillip* is a

sound one. There is a difference between asking whether a fetus can "be the *subject* of a wrongful death action" and asking whether "a fetus at the time of the wrongful death of its father but a born, living minor child at the time the action is brought" comes within the provisions of a protective statute. *Ellis v. Humana of Fla., Inc.*, 569 So. 2d 827, 828 (Fla. Dist. Ct. App. 1990).

The nature of the consortium claim asserted in this case on behalf of O.D.G. addresses that distinction and renders irrelevant Baldi's contention that "under the age of eight" does not include "negative age." *See* Iowa Code § 614.1(9)(*b*). For unborn children, the deprivation of consortium does not occur immediately upon the parent's death. *Crumpton v. Gates*, 947 F.2d 1418, 1422 (9th Cir. 1991). Instead, the deprivation occurs when the child is later born. *See Lopez v. Md. State Highway Admin.*, 610 A.2d 778, 780 (Md. 1992) ("It was only after he was born that Lopez suffered injury from the loss of his father's pecuniary support, and the paternal affection and guidance attending the [parental] relationship."); *see also Crumpton*, 947 F.2d at 1422 (holding although a parent died when their child "was *in utero*, the injury or suffering which flowed from [the death] occurred postnatally"). Thus, the consortium injury—the loss of Paul's support, companionship, aid, affection, comfort, and guidance, *see Gail v. Clark*, 410 N.W.2d 662, 668 (Iowa 1987)—for which suit was brought in this case on O.D.G.'s behalf arose upon O.D.G.'s birth, not before. Accordingly, we conclude it does not matter whether *a fetus* is "under the age of eight" within the meaning of section 614.1(9)(*b*); a newborn assuredly is. O.D.G.'s parental consortium claim is timely under section 614.1(9)(*b*).

We acknowledge that in *Doe*, we held children who were neither born nor conceived at the time their parent suffered a compensable

personal injury have no cognizable claim for loss of consortium due to the parent's injury. *See Doe*, 518 N.W.2d at 365. However, because O.D.G. was already in utero when Paul passed away, no part of today's holding is inconsistent with *Doe*. *See Angelini v. OMD Corp.*, 575 N.E.2d 41, 45–46 (Mass. 1991) ("[I]f an individual conceives a child, and the child is born after the individual's wrongful death, the child will be allowed to recover . . . ."); *Le Fevre v. Schrieber*, 482 N.W.2d 904, 907 (Wis. 1992) (concluding a posthumous child can bring a wrongful-death claim for the death of his parent if conceived before the death). The distinction between *Doe* and this case is important because, as we established in *Dunn*, parents enjoy a protected consortium interest in their relationship with their conceived-but-not-yet-born children. *Dunn*, 333 N.W.2d at 833. Our holding today simply recognizes that the protected relationship recognized in *Dunn* is reciprocal insofar as it recognizes a child's claim arising at birth for the loss of consortium with a parent whose wrongful death occurred after the child was conceived but before the child's birth. Whatever deprivation of consortium O.D.G. is currently experiencing is no less real just because she did not experience it while in utero. *See Weitl v. Moes*, 311 N.W.2d 259, 269 (Iowa 1981) ("[I]n any disruption of the parent-child relationship, it is probably the child who suffers most."), *overruled on other grounds by Audubon-Exira Ready Mix, Inc. v. Ill. Cent. Gulf R.R.*, 335 N.W.2d 148, 152 (Iowa 1983); *cf. Dunn*, 333 N.W.2d at 833 ("[P]arents' loss certainly does not vanish because the deprivation occurred prior to birth. To the deprived parent the loss is real either way.").

We emphasize that in deciding whether O.D.G. has a cognizable claim and whether it was filed within the applicable limitations period, "we can and do set completely aside all the philosophical arguments

about the status of the unborn.  Those arguments are not at issue here." *Dunn,* 333 N.W.2d at 833; *see also McKillip,* 191 N.W.2d at 709 ("We express no opinion as to the existence of the fetus as a person in either the philosophical or actual sense.").  Any reader who scours this opinion's interstices for implied sentiments about any context beyond the narrow parental consortium question presented undertakes a fool's errand.

O.D.G. qualifies for protection under section 614.1(9)(*b*) because she was a minor under the age of eight at the time the action was filed and because her alleged loss of consortium—the injury or occurrence for which she is seeking to recover—arose when she was born.  Iowa Code § 614.1(9)(*b*).  The district court therefore erred in granting summary judgment on O.D.G.'s parental consortium claim.

**B.  Wrongful Death and the Discovery Rule.**  We now turn to the wrongful-death and spousal consortium claims.  In *Schultze,* we concluded the limitations period for wrongful-death actions arising out of patient care "commences on the date the death is discovered."  *Schultze,* 463 N.W.2d at 48.  Since *Schultze,* we have not had occasion to consider any wrongful-death cases involving the discovery rule and what is now section 614.1(9)(*a*).[3]  Thus, in cases apart from *Schultze,* our consideration of the discovery rule in medical negligence cases has occurred exclusively with respect to nonfatal injuries.  Most recently, in

---

[3]Although we have considered other wrongful-death cases arising out of patient care since *Schultze,* those cases did not involve the discovery rule.  *See Estate of Anderson v. Iowa Dermatology Clinic, P.C.,* 819 N.W.2d 408, 419 (Iowa 2012) (concluding a plaintiff filed an action beyond the statute of repose); *Christy,* 692 N.W.2d at 703–04 (concluding the doctrine of fraudulent concealment estopped a defendant from asserting a statute-of-limitations defense, but noting the discovery rule is a separate question from fraudulent concealment).

*Rathje,* we concluded the limitations period under section 614.1(9)(*a*) commences "upon actual or imputed knowledge of both the injury and its cause in fact." *Rathje,* 745 N.W.2d at 461.

Our research reveals some disagreement among courts considering whether statutory language measuring the limitations period from death permits application of the discovery rule. *Compare, e.g., Collins v. Sotka,* 692 N.E.2d 581, 585 (Ohio 1998), *and Bradshaw v. Soulsby,* 558 S.E.2d 681, 688–89 (W. Va. 2001), *with, e.g., Moon v. Rhode,* 34 N.E.3d 1052, 1056 (Ill. App. Ct. 2015), *and Corkill v. Knowles,* 955 P.2d 438, 443 (Wyo. 1998). However, we do not join either side of that debate today. We need not decide whether the *Rathje* rationale is also compelling in death cases because we conclude even if the discovery rule applies, Brenna knew or should have known of a possible causal connection between Baldi's medical care and Paul's death more than two years before she filed the petition in this case. *See LaFage v. Jani,* 766 A.2d 1066, 1070 (N.J. 2001) ("Because we agree . . . that even if she could invoke the discovery rule Mrs. LaFage's wrongful death claim was untimely, we decline to address the broader question whether the discovery rule generally should be applicable . . . .").

1. *Brenna's prior testimony.* In the criminal case against Dr. Baldi, Brenna testified that before Paul's death, she expressed concern to Dr. Baldi about his treatment of Paul, shared with Dr. Baldi her desire for Paul to stop taking one medication Dr. Baldi had prescribed, and became frustrated because she perceived that Dr. Baldi either ignored her complaints or did not take them seriously:

> Q: Did you inquire about whether Paul should go to substance abuse treatment? A: I did.
>
> Q: And what was Dr. Baldi's response to that? A: Again, it just—it—to me, it seemed like it was a question

with a question. I never got an answer. I was asking the same questions for years and—well, for a period of time with no outcome.

Q: And during the course of the time that you were in Iowa, did Paul ever go to substance abuse treatment? A: He did not.

Q: At some point did you have a conversation with [Dr. Baldi] about how to record or document the concerns that you were having? A: I did. There was this one time Paul was just not in his right mind, not very coherent, and I dragged him in the office and I said, Okay, here you go. What do I do? . . . Dr. Baldi said, Just document it, take photos, write things down. So I started snapping pictures of him when he would be passed out or I would find pill bottles that he had just gotten that were empty that had disappeared, you know, and I would give them to him.

. . . .

Q: Were [the photos] taken—why were they taken? A: I was explaining that there were problems going on with this medication, and it was disappearing, and he was passing out in random places. . . . So when I was told to document, I figured, Well, okay, here it is. And I took them. Knowing that that is not how a medication bottle should be. And there shouldn't be white substances crushed into it. So I took them, hoping, Hey, we can get him off this. This is a problem. He can't—he doesn't do well with it.

. . . .

Q: When you said you were in the office three days to a week before his death, who was "we?" A: Myself and Paul.

Q: And did you see [Dr. Baldi] on that occasion? A: I did.

Q: And what did you talk to [Dr. Baldi] about? A: The first time I had saw a needle in my house was the week before Paul had passed. The first time I had seen one in years. When I had moved in, I had thrown away needles. So that was the prior time I had seen them in our house. I had told him, you know, I think he's using needles. The doctor. I had told the doctor. He checked Paul's hands, where he frequently had used intravenous drugs and had track marks. So his hands were scarred up. And he checked his arms, and he had not checked his feet.

Q: Did you suggest that to the doctor, that he should check his feet? A: I did. I also was told that he passed his

drug test, which he was—he had to, mandatory, take a drug test every time he went to a doctor's appointment. I was told that it was negative. And I didn't find out it was positive until after Paul had passed away. . . .

. . . .

Q: Did you share [a] desire with [Dr. Baldi]? The desire for Paul to be off . . . Xanax so you could get pregnant? A: Yes. Multiple times.

. . . .

Q: Now, this intervention that you described, that was not successful for Paul, was it? A: No. Nobody else believed me, as far—even the doctor.

Q: Ma'am, you never told Dr. Baldi about the intervention. A: Throughout the—because—it happened on Saturday. But I was going to the appointments, and I was documenting, and I was letting him know, He can't be on this. This is worrisome, throughout the years. So, therefore, Saturday had come, and I had found these needles. What difference did it make? I wasn't getting help from him. So what difference does it make? I don't understand about—if he knew about the intervention or not. He was dead 24 hours later.

Brenna also gave a March 2014 deposition in the criminal case against Dr. Baldi. In that sworn testimony, she stated that in late January 2012, she had a few conversations about Dr. Baldi's treatment of Paul with a state investigator from the Iowa Department of Inspections and Appeals:

Q: What about investigators, have you talked to any . . . investigators? A: An investigator came to me. His name was Troy Wolff, DIA, I believe.

Q: When did you and Mr. Wolff first have contact? A: Oh, boy. He showed up at my house. I was still residing in Johnston in Paul and I's home, two years ago, a year and a half ago maybe. I really couldn't—two years ago, I would say, a little over two years.

Q: And you said he showed up. He didn't call before he—? A: I pulled in my house, and there was a car there, and that's how he showed up.

Q: And what did he say to you when he was sitting there at your house?  A: He wanted some—just if I had any information about my husband's treatment with his pain doctor and just some information about my husband and life, you know, just general things.

. . . .

Q: And when Investigator Wolff showed up at your house in Johnston, do you have a date for that or approximate date?  A: It was winter.  I—I don't.

. . . .

Q: If I said January 30th of 2012, would that seem about right?  A: Yes.  It was winter.  I just—yeah.

Q: How many visits had you had with Troy Wolff in person?  A: Three or four maybe.

Q: And where did those visits take place?  A: My home in Johnston at the time and his office downtown.

Q: And to the best of your memory those visits, three or four of those?  A: I think so, yes.

Q: And you had contact with him by e-mail as well as—  A: And phone.

Q: —phone.  And what did Mr. Wolff tell [you] this criminal case was all about?  A: Doctor Baldi, and he was there to speak to me about my husband's care with Doctor Baldi.

Baldi presented these transcript excerpts to the district court in support of the motion for summary judgment in this case.

In *LaFage*, the plaintiff consulted an attorney and a medical expert less than a month after the decedent's death in March 1995—and in fact, the medical expert opined "he believed . . . [the plaintiff] had an overwhelming case of malpractice against all of the health care providers." *LaFage*, 766 A.2d at 1068.  However, the plaintiff did not file a lawsuit until April 1997.  *Id.*  The New Jersey Supreme Court concluded even if the discovery rule applied, the plaintiff's claim was time-barred because she filed it more than two years after "she knew she

had a basis for a wrongful death—medical malpractice claim." *LaFage*, 766 A.2d at 1070.

Similarly, in a West Virginia case, the plaintiff "believed that the [h]ospital was negligent in its treatment" even before the decedent's death. *Mack-Evans v. Hilltop Healthcare Ctr., Inc.*, 700 S.E.2d 317, 323 (W. Va. 2010). The plaintiff's deposition testimony further established her knowledge at the time the decedent died "that conduct by the [h]ospital may have caused [the] death." *Id.* at 324. The deposition testimony was an important factor in the court's conclusion that the discovery rule did not extend the time to file more than two years past the date of death and that "the trial court was correct in granting summary judgment to the [h]ospital." *Id.*

Here, Brenna's testimony in the criminal case against Dr. Baldi establishes she had been frustrated and dissatisfied with Baldi's medical care even before Paul's death. Although her frustration and dissatisfaction with Dr. Baldi's medical care provided before Paul's death do not conclusively establish Brenna's knowledge of a causal connection between the medical care and Paul's subsequent death, after Brenna met with Investigator Wolff in January 2012, she knew or should have known Dr. Baldi's care of Paul and others had prompted the state to investigate Dr. Baldi. In other words, Brenna knew or had reason to know by January 30, 2012, that the state was investigating whether Dr. Baldi's conduct in treating several patients was substandard. We conclude the discovery rule, even if applied here, would not save the estate's wrongful-death claim or Brenna's consortium claim because the record establishes as a matter of law that Brenna knew or should have known of a possible connection between Paul's death and Baldi's medical care more than two years before this action was filed on February 14, 2014.

2. *Brenna's affidavit does not engender a material fact issue.* The excerpts from Brenna's testimony in the criminal case against Dr. Baldi are not the only evidence in the summary judgment record addressing the factual question of when Brenna knew or should have known the causal connection between Baldi's care and Paul's death. In resisting Baldi's motion for summary judgment, Brenna filed an affidavit stating that to the best of her "knowledge, recollection, understanding[,] and belief," she did not discover Baldi might have caused or contributed to Paul's death until less than two years before the petition was filed. However, we conclude the affidavit does not engender a genuine issue of material fact and does not preclude summary judgment because it contradicts her earlier sworn testimony.

> Summary judgment serves an important purpose:
>
> Every trial court has on its docket some pleaded claims and defenses which are actually without substance and exist only on paper. To obviate the labor and expense of trial to expose those empty vessels, summary judgment procedure was conceived. By proper motion, a party can compel his adversary to come forth with specific facts which constitute competent evidence showing a prima facie claim or defense. Paper cases and defenses can thus be weeded out to make way for litigation which does have something to it.

*Gruener v. City of Cedar Falls*, 189 N.W.2d 577, 580 (Iowa 1971). "Frequently the question on motions for summary judgment is whether the showing in resistance to the motion is adequate." *Sherwood v. Nissen*, 179 N.W.2d 336, 338 (Iowa 1970). Here, the showing in resistance to the motion was inadequate because it contradicted Brenna's earlier sworn testimony without any explanation for the discrepancy.

Some courts apply a rule providing a party opposing summary judgment may not manufacture a material fact issue simply by filing an

affidavit that directly contradicts prior testimony. *See Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365–66 (8th Cir. 1983) (setting forth the rule in the United States Court of Appeals for the Eighth Circuit that an affidavit creating only "a sham issue of fact instead of a genuine" one does not preclude summary judgment); *see also Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005) (declining to decide whether Iowa should follow a similar rule because it was inapplicable to the circumstances then before the court). Most courts refer to this rule as the "sham affidavit" rule or doctrine, and although we have not explored it in detail, "most states that have addressed the issue" and most federal circuit courts of appeals apply some version of it. David F. Johnson & Joseph P. Regan, *The Competency of the Sham Affidavit as Summary Judgment Proof in Texas*, 40 St. Mary's L.J. 205, 208–11 & nn.11–14 (2008).

"The rule is . . . rooted in the very mission of the summary judgment procedure[.]" *Yahnke v. Carson*, 613 N.W.2d 102, 107 (Wis. 2000). It "calls for the rejection of the affidavit where the contradiction is unexplained and unqualified by the affiant." *Shelcusky v. Garjulio*, 797 A.2d 138, 144 (N.J. 2002). An unpublished court of appeals decision addressing a substantive inconsistency between a party's deposition testimony and his affidavit supporting a resistance to a motion for summary judgment succinctly demonstrates the rule's application:

> In his affidavit attached to Anita Dairy's resistance to the motion for summary judgment, Mr. Kragelund asserted that Anita Dairy relied "exclusively on [Midwest Dairy] to provide an upgraded milking system." We conclude the affidavit is insufficient, when taken together with the other information before the district court, to prevent summary judgment. A party resisting summary judgment "cannot create sham issues of fact in an effort to defeat summary judgment." Mr. Kragelund's affidavit is inconsistent with the substance of his deposition testimony . . . . In particular, the

> depositions clearly establish that the Kragelunds did not exclusively rely on Peterson and Midwest Dairy . . . either to remove the old stalls and install the new ones or to perform the electrical work on the project.  Accordingly, we conclude Mr. Kragelund's affidavit did not suffice to engender a genuine issue of fact.

*Anita Dairy, L.C. v. Kooiman*, No. 03–0966, 2005 WL 67126, at *3 (Iowa Ct. App. Jan. 13, 2005) (quoting *Am. Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 111 (8th Cir. 1997)).  We reach a similar conclusion today as we determine Brenna's affidavit was insufficient to engender a fact question on the issue of whether she knew or should have known of a causal connection between Baldi's medical care and Paul's death more than two years prior to filing this action.  However, in doing so, we emphasize several important caveats.

First, the rule we adopt today is not limited to affidavits characterized by fraud or malfeasance.  Thus, we prefer the moniker "contradictory affidavit rule" rather than "sham affidavit rule."  Second, the contradictory affidavit rule "is subject to . . . important exceptions" that render the rule inapplicable if the affiant offers a reasonable explanation for any apparent contradiction between their affidavit and other sworn testimony.  *Yahnke*, 613 N.W.2d at 108.  A reasonable explanation might be, for example, that an affidavit clarifies ambiguous or confusing earlier testimony or reacts to newly discovered evidence.  *Id.*; *see also Shelcusky*, 797 A.2d at 150 (concluding an affidavit offered to resist summary judgment engendered a material fact issue because it merely "sought to clarify [the plaintiff's] previous representations").  Third (and relatedly), to invoke the rule, "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous."  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009); *cf. Lales v. Wholesale Motors Co.*, 328 P.3d 341, 360 (Haw.

2014) (concluding the contradictory affidavit rule was not applicable "because [the] declaration was not clearly and unambiguously inconsistent with [the] prior deposition").

We conclude Brenna's affidavit clearly and unambiguously contradicts her earlier sworn testimony in the criminal case against Dr. Baldi. Although Brenna did not expressly testify in the criminal case that she knew or should have known of the causal connection between Baldi's care and Paul's death more than two years prior to filing this action, the conflict between her sworn (deposition and trial) testimony in the criminal case and her subsequent affidavit in this civil case is inescapable. Before Paul's death, Brenna concluded Paul was struggling with the dosages Baldi prescribed, requested (unsuccessfully) that Baldi prescribe different or fewer medications, and became frustrated when, in her view, Baldi didn't do enough to treat Paul's obvious addictions. By at least January 30, 2012, Brenna knew the state was investigating Dr. Baldi's medical care of Paul and other patients. Her affidavit stating she did not know or have reason to know of a possible causal connection between Baldi's medical care and Paul's death until at least a month later provides no clarification or explanation as to why her earlier testimony in the criminal case was ambiguous, mistaken, or incomplete.

Furthermore, "the more important the fact contradicted by the affidavit is to the outcome of the litigation, the more likely a [trial] court will be justified in refusing to consider the [conflicting] affidavit." *McMaster v. Dewitt*, 767 S.E.2d 451, 457 (S.C. Ct. App. 2014). In *McMaster*, the court applied this principle when the key dispute in the affidavit resisting summary judgment was about "a fact . . . pivotal to whether the statute of limitations bars [the] claim." *Id.* We apply the principle here.

Most courts applying the contradictory affidavit rule do so when the plaintiff provides deposition testimony and a contradictory affidavit in the same case. *See, e.g., Yeager v. Bowlin*, 693 F.3d 1076, 1079 (9th Cir. 2012); *Hanover Ins. Co. v. Leeds*, 674 N.E.2d 1091, 1094–95 (Mass. App. Ct. 1997); *Hanna v. Cloud 9, Inc.*, 889 P.2d 529, 533–34 (Wyo. 1995). We conclude the rule can also apply when, as in this case, the previous testimony was presented at trial in a different proceeding. *See Cothran v. Brown*, 592 S.E.2d 629, 633 n.3 (S.C. 2004) (discussing the rule in a civil wrongful-death action in which a party submitted an affidavit conflicting with prior trial testimony). The rule can apply if the two proceedings feature a common factual nucleus and the same person provides both the earlier testimony and the later conflicting affidavit. *See Doe v. Swift*, 570 So. 2d 1209, 1213–14 (Ala. 1990) (applying the contradictory affidavit rule when the plaintiff's affidavit opposing summary judgment contradicted her own testimony in a previous federal civil trial arising out of the same facts); *Luttgen v. Fischer*, 107 P.3d 1152, 1156 (Colo. App. 2005) (disregarding the plaintiff's affidavit offered in opposition to a motion for summary judgment in a legal malpractice case because it contradicted her deposition in that case and her testimony in the trial giving rise to the malpractice claim).

Applying the contradictory affidavit rule within the parameters we have established, we disregard Brenna's affidavit in support of her resistance to Baldi's motion for summary judgment on the estate's wrongful-death claim and Brenna's consortium claim. The other evidence in the summary judgment record tends to establish the estate's wrongful-death claim and the spousal consortium claim were untimely as a matter of law. The district court did not err in granting summary judgment as to those claims under the circumstances presented here.

We add a few final observations. First, our decision today does not undercut or call into question the maxim that "negligence cases do not ordinarily lend themselves to summary adjudication." *Virden v. Betts & Beer Constr. Co.*, 656 N.W.2d 805, 807 (Iowa 2003). This summary adjudication rests not on the ultimate question whether Baldi was negligent, but on the threshold question whether Gray timely filed a petition. *See Daboll v. Hoden*, 222 N.W.2d 727, 733–34 (Iowa 1974) (acknowledging it is "rare" that summary judgment is proper in a negligence case, but concluding summary judgment on a limitations ground does not address the question of negligence). Second, our resolution of the issues on appeal makes it unnecessary for us to address Gray's constitutional arguments. Finally, O.D.G.'s parental consortium claim may proceed even though the wrongful-death and spousal consortium claims may not. *See Christy*, 692 N.W.2d at 706 (acknowledging a child's claim can be "prosecuted independently if the wrongful death claim is already barred under paragraph (*a*) of section 614.1(9)").

### V. Conclusion.

The district court erred in granting summary judgment on O.D.G.'s parental consortium claim because O.D.G. was a minor at the time the action was filed and because she was under the age of eight at the time of the occurrence for which she is seeking to recover. Iowa Code § 614.1(9)(*b*). We reverse that part of the district court's summary judgment ruling. The district court did not err, however, in granting summary judgment on the estate's wrongful-death claim and Brenna's spousal consortium claim. We do not revisit today whether the discovery rule applies after *Rathje* to wrongful-death claims arising from negligent medical care because even if the rule were to be applied, the estate's

wrongful-death claim and Brenna's spousal consortium claim were untimely as a matter of law under the circumstances presented here.  We therefore affirm in part, reverse in part, and remand for further proceedings on the parental consortium claim.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Appel, J., who takes no part.