# IN THE COURT OF APPEALS OF IOWA

No. 17-0908
Filed November 7, 2018

**SHARON K. SUSIE, an individual, and LARRY D. SUSIE, an individual,**
    Plaintiffs-Appellants,

**vs.**

**FAMILY HEALTH CARE OF SIOUXLAND, P.L.C., d/b/a FAMILY HEALTH CARE OF SIOUXLAND URGENT CARE, a professional limited liability company; and SARAH HARTY, P.A.C., an individual,**
    Defendants-Appellees.

_____

        Appeal from the Iowa District Court for Woodbury County, John D. Ackerman, Judge.


        Plaintiffs appeal the district court decision granting summary judgment to defendants in this medical malpractice action. **REVERSED AND REMANDED.**


        Marc A. Humphrey of Humphrey Law Firm, PC, Des Moines, for appellants.

        Jack D. Hilmes, Erik P. Bergeland, and Kellen B. Bubach of Finley Law Firm, PC, Des Moines, for appellees.


        Considered by Potterfield, P.J., and Bower and McDonald, JJ.

**BOWER, Judge.**

Sharon and Larry Susie appeal the district court decision granting summary judgment to defendants in this medical malpractice action. We determine the district court improperly granted summary judgment to defendants on the issue of negligence and the issue of lost chance of a cure. Plaintiffs presented adequate expert testimony on a causal relationship between the defendants' actions and the injury sustained. We reverse the decision of the district court and remand for further proceedings.

## I. Background Facts & Proceedings

On September 22, 2012, Sharon Susie tripped on a rug in her living room and fell on her right arm. She stated it felt like she had a rug burn and bruising. Her condition did not improve. Sharon stated, "I felt there was something seriously wrong. It hurt really bad." She stated she had a shooting pain in her arm.

On September 29, Sharon went to Family Health Care of Siouxland Urgent Care (Family Health Care), where she saw Sarah Harty, a physician's assistant. Harty ordered an x-ray of Sharon's arm, which showed no broken bones but "moderate soft tissue swelling about the elbow joint dorsally." Harty noticed swelling, bruising, tenderness to palpitation, and limited range of motion in Sharon's right arm. Sharon's temperature was 99.7 degrees and she felt like she was going to faint. Harty gave Sharon a shot for pain and a prescription for pain pills. Sharon was advised to see her regular physician in two days if her condition did not improve.

The next day, September 30, Sharon's adult son, Brian Susie, stopped by to see her in the morning and found she was extremely ill. Sharon's husband,

Larry Susie, took her to the emergency room at Mercy Hospital Medical Center in Sioux City. Sharon was diagnosed with septic shock and kidney failure. She was placed on intravenous antibiotics. Sharon's condition continued to deteriorate and doctors determined she had necrotizing fasciitis, also known as flesh-eating disease. On October 2, Sharon's right arm was amputated in order to stop the progression of the disease which was life threatening. The medications she received reduced blood-flow to her extremities and, consequently, eight of her toes were amputated. She was discharged from the hospital on November 6.

On September 26, 2014, Sharon and Larry (Susies) filed an action against Family Health Care and Harty (defendants), claiming defendants were negligent because Sharon's condition was not properly diagnosed and she did not receive timely treatment from defendants. The Susies also claimed defendants' actions resulted in the loss of a chance to save Sharon's arm and toes from amputation.

The Susies designated Dr. John Crew as an expert. The Susies provided an expert witness summary pursuant to Iowa Rule of Civil Procedure 1.508. Dr. Crew was expected to testify Sharon should have been given a blood test at the time she went to Family Health Care, which would have shown an infection. Dr. Crew stated Sharon should have been prescribed antibiotics, not pain medication, on September 29, 2012. In Dr. Crew's opinion, "had the infection been diagnosed and treatment commenced immediately, the spread of the infection could have been avoided, the infection would not have become systemic; and the amputation of Sharon's arm and toes would more likely than not been avoided." The defendants deposed Dr. Crew on November 10, 2015.

On March 2, 2016, defendants filed a motion in limine, seeking to prohibit the Susies' experts—Dr. Crew and Jeffrey Nicholson, a physician's assistant—from offering causation opinions. Defendants claimed "Plaintiffs' experts have utterly failed to establish that, more likely than not, Sharon Susie's ultimate outcome would have been changed if antibiotics were administered and prescribed on September 29, 2012." The district court ruled the issue of whether the Susies had presented "sufficient testimony on the causation issue to submit the matter to the jury" would be determined "at the end of the plaintiffs' case-in-chief."

Shortly before the scheduled trial date of March 8, 2016, the defendants filed a motion to preclude testimony from Brian Susie and the Susies' mail carrier, Jody Russell, concerning their observations of an abrasion on Sharon's arm in the days before she was seen by Harty at Family Health Care. The defendants stated they had previously only been informed of proposed testimony from these witnesses concerning bruising of Sharon's arm. The Susies resisted the defendants' motion.[1] The court granted the defendants' request for a continuance to permit them to conduct depositions.

The trial was rescheduled for May 9, 2017. Prior to the new trial date, the Susies' designated expert, Dr. Crew, died. On April 11, 2017, the Susies' designated Dr. Roger Schechter as an expert witness. Dr. Schechter is a specialist in chronic wound care who treats patients with necrotizing soft tissue diseases,

---

[1] At the hearing on the motion, counsel for the Susies stated:
> The truth is the truth. Observations of witnesses are observations of witnesses. And just because it was not discovered until late in the game doesn't mean that we ought to exclude it if we truly are searching for the truth in this case. And that's the record that I would like to make.

such as necrotizing fasciitis. The rule 1.508 summary of Dr. Schechter's opinion stated:

> Dr. Schechter will also opine to a reasonable degree of medical probability regarding the treatability of Sharon Susie's infection at the point of time she presented to the urgent care clinic on September 29, 2012. He is expected to testify that had the infection been diagnosed on the day of her visit to the clinic, and treatment initiated immediately, the spread of the infection, more likely than not, could have been avoided, the infection would not have become systemic; and the amputation of Sharon's arm and toes would more likely than not have been avoided.

Dr. Schechter's deposition was taken on April 25, 2017. Dr. Schechter testified he had the ability to diagnose necrotizing soft tissue infections. Dr. Schechter testified, "I shared [Dr. Crew's] opinions regarding the diagnosis and the management that was underwent by plaintiff." In the deposition he stated,

> Q. Or are you here to say that Sharon Susie's arm was cut off because of Sarah Harty? A. I'm not here to say her arm was cut off because of Sarah Harty. I'm here to say that she became ill and septic because she wasn't given a thorough enough evaluation and follow-up.

Dr. Schechter stated Sharon should have been given a blood test to determine if she had an infection. He stated, "The sooner you initiate supportive care and the appropriate care, the lesser the potential for deterioration, especially in a situation such as infection." Dr. Schechter also testified, "I would say it's a significant possibility ranging as high as probability that early intervention with antibiotics could have either at least reduced the progression of the infection or slowed its progression and potentially have averted as much tissue loss as she experienced."

Defendants filed a motion for summary judgment on May 4, 2017, claiming the Susies did not have adequate expert testimony to support their causation claims. They claimed Dr. Schechter provided only speculation as to whether the

administration of antibiotics would have made a difference to the outcome of the case. The defendants claimed Sharon had necrotizing fasciitis at the time she saw Harty on September 29, 2012. Necrotizing fasciitis causes the destruction of cells. If the cells are no longer receiving blood, they no longer receive antibiotics if they are administered. The defendants claim even if Sharon had been given antibiotics on September 29, 2012, it would not have helped her condition. Defendants noted the Susies' experts could not express any opinions beyond that found in the rule 1.508 summaries.

The Susies resisted the motion, stating the court should deny the motion for the same reasons the defendants' motion in limine was denied in March 2016. The Susies claimed Sharon had cellulitis, a skin infection, on September 29, 2012, which could have been treated with antibiotics, and the cellulitis developed into necrotizing fasciitis by the next day. The Susies stated the court should consider Dr. Schechter's rule 1.508 summary and his deposition testimony. They additionally pointed out Dr. Daniel Lamptey, an infectious disease specialist who treated Sharon, stated she had a bacterial infection, which had progressed to necrotizing fasciitis. Dr. Lamptey stated, "[T]he sooner you can see a patient with an infectious condition and start the antibiotics, the better the likelihood you can have some impact on the progression of this disease into something more serious." Dr. William Rizk, the surgeon who amputated Sharon's arm, stated, "If you get the antibiotics on board early, they usually work." Also, defendants' expert, Dr. Ravi Vemuri, an infectious disease specialist, stated Sharon had an infection caused by a type of bacteria which can be treated with antibiotics. The Susies claimed the

entire record showed summary judgment was not appropriate on the issue of causation.

A hearing on the motion for summary judgment was held on May 8, 2017, and the court ruled from the bench, as follows:

> Okay. It's clear to me even—and I know, Mr. Humphrey, you wanted to make sure I read all your other physician stuff. I did that. I still believe and I find that there is no—that you don't have the necessary expert more likely than not causation evidence to get the claim to a jury.
>
> Now, Schechter, every time he was really forced or asked the major question, he said speculation, I don't know what the outcome would have been, may have made a difference. I don't care what's in his 1.508 because when you're asked under oath in a deposition, are these your final opinions, he's stuck with those. And he didn't give more likely than not in his deposition.
>
> Your plaintiff's treating physicians basically said, listen, the earlier you get antibiotics, the better chance you have. What's the other phrase? Time is tissue. Lamptey said it may well stop it from progressing. Rizk says, well, if you get antibiotics early, they usually work. Let's see. Where's the other one? Earlier the antibiotics, better likely the outcome for the patient. I think all your treaters said that.
>
> The problem is—with that is they did not give an opinion in this case with these facts whether or not it would have made a difference. What it does normally doesn't push you over the line.

The court granted summary judgment to defendants. The Susies now appeal the decision of the district court.

## II. Standard of Review

"We review district court summary judgment rulings for corrections of errors at law." *McQuistion v. City of Clinton*, 872 N.W.2d 817, 822 (Iowa 2015). "Summary judgment is properly granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* We view the record in the light most favorable to the nonmoving party. *Banwart v. 50th St. Sports, LLC*, 910 N.W.2d 540, 545 (Iowa 2018). "Even if facts are undisputed,

summary judgment is not proper if reasonable minds could draw from them different inferences and reach different conclusions." *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 (Iowa 2014).

### III.     Summary Judgment

**A.**     The Susies claim the district court improperly granted summary judgment to defendants on the issue of negligence.  They state the court should have considered all of the evidence presented in their resistance to the motion, rather than focusing only on Dr. Schechter's deposition testimony.  They state the court should have looked at Dr. Schechter's rule 1.508 summary and the depositions of Dr. Lamptey, Dr. Rizk, and Dr. Vemuri, as well as Dr. Schechter's deposition.  The Susies claim they presented evidence to show Sharon had a bacterial infection on September 29, 2012, the type of bacteria in her body was susceptible to treatment by antibiotics, and if Sharon had been given antibiotics earlier it could have stopped the bacterial infection prior to the point it developed into necrotizing fasciitis.  They claim they presented a genuine issue of material fact on the question of whether defendants' negligence in diagnosing and treating Sharon caused her injuries.

In order to establish a prima facie case of medical malpractice, a plaintiff must produce evidence establishing (1) the applicable standard of care, (2) a violation of this standard, and (3) a causal relationship between the violation and the injury sustained.  *Oswald v. LeGrand*, 453 N.W.2d 634, 635 (Iowa 1990).  "Expert testimony is nearly always required to establish each of those elements." *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 718 (Iowa 2001).  "Professional liability cases, especially medical malpractice actions, require expert testimony of

a technical nature concerning standards of care and causation." *Cox v. Jones*, 470 N.W.2d 23, 25 (Iowa 1991).

"Summary judgment is proper when the plaintiff's claim lacks evidence to support a jury question on an essential element of the claim." *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). Summary judgment may be proper when expert testimony is necessary to establish an element of a medical malpractice action, and the plaintiff has not presented the necessary expert testimony to support the element. *Kennis v. Mercy Hosp. Med. Ctr.*, 491 N.W.2d 161, 167 (Iowa 1992). The parties agreed expert testimony was necessary to establish causation in this case. *See Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 792 (Iowa 2009) (noting expert medical testimony is required unless "the plaintiff's injury is within the knowledge and experience of an ordinary layperson").

Where expert testimony is necessary to establish causation, "[t]he rule is that expert testimony indicating *probability* or *likelihood* of a causal connection is sufficient to generate a question on causation." *Hansen v. Cent. Iowa Hosp. Corp.*, 686 N.W.2d 476, 485 (Iowa 2004). Absolute certainty is not required and the evidence of causation does not need to be conclusive. *See Ranes*, 778 N.W.2d at 688. "Buzzwords like 'reasonable degree of medical certainty' are therefore not necessary to generate a jury question on causation." *Hansen*, 686 N.W.2d at 485.

The Iowa Supreme Court has stated:

> Evidence indicating a probability or likelihood of the causal connection is necessary to generate a jury issue. However, this "probability" may be inferred by combining an expert's "possibility" testimony with nonexpert testimony that the described condition of which complaint is made did not exist before occurrence of those facts alleged to be the cause thereof.

*Becker v. D & E Distrib. Co.*, 247 N.W.2d 727, 730 (Iowa 1976) (citations omitted);

*see also Oak Leaf Country Club, Inc. v. Wilson*, 257 N.W.2d 739, 747 (Iowa 1977)

("[T]he 'probability' of causal connection necessary to generate a jury question

need not come solely from one witness.").

In his deposition, Dr. Schechter[2] testified, "I would say it's a significant

possibility ranging as high as *probability* that early intervention with antibiotics

could have either at least reduced the progression of the infection or slowed its

progression and potentially have averted as much tissue loss as she experienced."

(Emphasis added.)

Additionally, Dr. Schechter stated in the rule 1.508 summary[3]:

---

[2] The dissent states, "[I]t is unclear whether Dr. Schechter is qualified to opine on the issue of causation." This issue was not raised in the motion for summary judgment, the resistance to the motion, or the reply to the resistance. If the issue had been properly raised, we would note Iowa Rule of Evidence 5.702 provides, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise . . . ." Dr. Schechter is board certified and a specialist in chronic wound care. He stated he treated patients for necrotizing soft tissue infections, including necrotizing fasciitis. We believe Dr. Schechter's testimony was within his general area of expertise, and therefore, he could testify as an expert on the issue of causation in this case. *See Quad City Bank & Tr. v. Jim Kircher & Assocs., P.C.*, 804 N.W.2d 83, 93 (Iowa 2011).

[3] The dissent claims the rule 1.508 summary should not be considered because it is not a sworn statement. Instead of the statement, "I certify under penalty of perjury and pursuant to the laws of the state of Iowa that the preceding is true and correct," as found in Iowa Code section 622.1(2) (2017), the 1.508 summary states, "Dr. Schechter has read the above summary and it's true and correct as he verily believes."

We first note this issue was not raised by the parties. In fact, the defendants' argument in their memorandum of authorities in support of the motion for summary judgment cites rule 1.508 and states the Susies' expert should be limited to the opinions previously offered. This argument apparently accepts Dr. Schechter should be permitted to express the opinions found in his 1.508 summary, while stating he should not be able to express any opinions beyond those found in the rule 1.508 summary. *See Millis v. Hute*, 587 N.W.2d 625, 628 (Iowa Ct. App. 1998) (noting expert medical testimony "did not go beyond the fair scope of the written report").

Second, the dissent's argument is based on federal cases. There is no citation to Iowa cases, nor have any Iowa cases been found, which state an unsworn rule 1.508 summary may not be considered in a motion for summary judgment.

Dr. Schechter will also opine to a reasonable degree of medical *probability* regarding the treatability of Sharon Susie's infection at the point of time she presented to the urgent care clinic on September 29, 2012. He is expected to testify that had the infection been diagnosed on the day of her visit to the clinic, and treatment initiated immediately, the spread of the infection, *more likely than not*, could have been avoided, the infection would not have become systemic; and the amputation of Sharon's arm and toes would *more likely than not* have been avoided.

(Emphasis added.)

The rule 1.508 summary and Dr. Schechter's deposition, taken together, indicate the probability or likelihood of a causal connection between defendants' failure to administer antibiotics on September 29, 2012, and the injury to Sharon. *See Hansen*, 686 N.W.2d at 485. Additionally, the deposition testimony of Dr. Lamptey, Dr. Rizk, and Dr. Vemuri further supports the Susies' claim of causation through statements showing the type of bacteria infecting Sharon could be treated with antibiotics, if caught early enough.

Looking at all of the evidence presented in the Susies' resistance to the motion for summary judgment, rather than just considering Dr. Schechter's deposition as the dissent has done, we conclude the Susies presented sufficient evidence to generate a jury question on the issue of causation. *See Oak Leaf*, 257 N.W.2d at 747 (finding evidence "of causal connection necessary to generate a

---

Third, even if the federal cases apply, an unsworn expert report may be cured by "providing a subsequent affidavit or deposition testimony of the expert reiterating or reaffirming the opinions in the unsworn report." *Maytag Corp. v. Electrolux Home Prods., Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006). During Dr. Schechter's deposition, regarding the rule 1.508 summary he stated he "used my own terms, wording and my own opinion on that." Dr. Schechter was asked if anything needed to be added or corrected in the rule 1.508 summary and he added some details about aftercare. From Dr. Schechter's answer, we can infer he reaffimed everything in his report, except for the small portion where he added additional detail. We believe Dr. Schechter's testimony during his deposition cured any potential problems with his rule 1.508 summary.

jury question need not come solely from one witness"). We note, in general, "[c]ausation is a question for the jury, '*save in very exceptional cases* where the facts are so clear and undisputed, and the relation of cause and effect so apparent to every candid mind, that but one conclusion may be fairly drawn therefrom.'" *Thompson v. Kaczinski*, 774 N.W.2d 829, 836 (Iowa 2009) (citations omitted). We determine the district court improperly granted summary judgment to defendants on the issue of negligence.

**B.** The district court also granted summary judgment to defendants on the Susies' claims defendants' actions resulted in the loss of a chance to save Sharon's arm and toes from amputation. The court found "in the loss-of-chance action that there is a lack of any reliable expert testimony to establish what percentage of chance was lost without the fact finder engaging in speculation." The Susies claim the district court improperly granted summary judgment to defendants on this issue.

A plaintiff may recover when a defendant's failure to diagnose and treat a condition caused the plaintiff to be denied a chance to be cured from the condition. *DeBurkarte v. Louvar*, 393 N.W.2d 131, 137 (Iowa 1986). A plaintiff may recover even when the loss of a chance is less than fifty percent. *Wendland v. Sparks*, 574 N.W.2d 327, 333 (Iowa 1998). Expert testimony is necessary to show the defendant's actions probably caused a reduction in the plaintiff's chance of a cure. *DeBurkarte*, 393 N.W.2d at 137–38. "As developed in our case law, the last-chance-of-survival doctrine is not an alteration of the traditional rules for determining proximate cause, but, rather, the creation of a newly recognized compensable event to which those traditional rules apply." *Mead v. Adrian*, 670

N.W.2d 174, 178 (Iowa 2003). In a lost-chance case, a plaintiff is entitled to damages for "the percent of lost chance attributed to the intervening act of negligence." *Id.* at 179.

The district court granted summary judgment because the Susies did not present expert testimony of a specific percentage of chance lost by the defendants' actions. The Iowa Supreme Court addressed this is in a footnote in *Mead*:

> Dr. Adrian argued to the district court that in order to sustain a recovery for lost chance of survival there must be expert testimony concerning the probability of survival expressed as a percentage. We believe that when the claim is submitted as an alternative to ordinary wrongful-death damages it is unrealistic to require a claimant who is arguing that it is more probable than not that death resulted from the defendant's negligence to also present evidence that the probability of survival was in fact some lesser percentage. The jury must determine the amount of proportionate reduction based on all of the evidence in the case.

*Id.* at 180 n.5.

We determine summary judgment is not appropriate simply because the Susies did not present expert testimony "concerning the probability of survival expressed as a percentage." *See id.* The Susies presented expert testimony to show Sharon's chance of a cure from necrotizing fasciitis was reduced due to defendants' actions. Dr. Schechter testified in his deposition, "I would say it's a significant possibility ranging as high as probability that early intervention with antibiotics could have either at least reduced the progression of the infection or slowed its progression and potentially have averted as much tissue loss as she experienced." Additionally, Dr. Lamptey, Dr. Rizk, and Dr. Vemuri stated the early administration of antibiotics could have slowed or stopped the progression of the

bacterial infection in Sharon's arm.  We determine the district court improperly granted summary judgment to defendants on the issue of lost chance of a cure.

We reverse the decision of the district court and remand for further proceedings.

**REVERSED AND REMANDED.**

Potterfield, J., concurs; McDonald, J., dissents.

**McDONALD, Judge** (dissenting)

Like the district court, I conclude the plaintiffs failed to establish a prima facie case of medical malpractice. Specifically, the summary judgment record shows there is no competent evidence creating a triable issue of fact on the element of causation. Because I would affirm the judgment of the district court, I respectfully dissent.

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). The party seeking summary judgment has the burden of establishing that the facts are undisputed and that the party is entitled to judgment as a matter of law. *See Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 677 (Iowa 2004). When a motion for summary judgment is made and properly supported, however, the opposing party may not rest upon the mere allegations or denials of the pleadings. *See* Iowa R. Civ. P. 1.981(5); *Bitner v. Ottumwa Cmty. Sch. Dist.*, 549 N.W.2d 295, 299 (Iowa 1996). Instead, the resisting party must set forth specific material facts, supported by competent evidence, establishing the existence of a genuine issue for trial. *See* Iowa R. Civ. P. 1.981(5); *Bitner*, 549 N.W.2d at 299. "A fact is material if it will affect the outcome of the suit, given the applicable law." *Parish v. Jumpking, Inc.*, 719 N.W.2d 540, 543 (Iowa 2006). An issue of fact is "genuine" if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *See Fees v. Mutual Fire & Auto. Ins. Co.*, 490 N.W.2d 55, 57 (Iowa 1992). It is well established that "[s]peculation is not sufficient to generate a genuine issue of fact."

*Waddell v. Univ. of Iowa Cmty. Med. Servs., Inc.*, No. 17-0716, 2018 WL 4638311, at *3 (Iowa Ct. App. Sept. 26, 2018). If the summary judgment record shows that the resisting party cannot establish a prima facie case, the movant is entitled to judgment as a matter of law. *See Robinson v. Poured Walls of Iowa, Inc.*, 553 N.W.2d 873, 875 (Iowa 1996) (stating if the "resisting party has no evidence to factually support an outcome determinative element of that party's claim, the moving party will prevail on summary judgment"); Iowa R. Civ. P. 1.981(3).

"Although sometimes labeled [a] 'medical malpractice' action[], a claim that a professional has failed to meet the applicable standard of care is essentially a negligence cause of action." *Asher v. OB-Gyn Specialists, P.C.*, 846 N.W.2d 492, 498 (Iowa 2014), overruled on other grounds by *Alcala v. Marriott Int'l., Inc.*, 880 N.W.2d 699, 708 (Iowa 2016). As a species of negligence, the medical-malpractice action is governed by the factual causation and scope of liability approach set forth in the Restatement (Third) of Torts. *See id.* at 498–99. Under this approach, "[c]onduct is a factual cause of harm when the harm would not have occurred absent the conduct." *Id.* at 500 (quoting Restatement (Third) of Torts: Physical & Emotional Harm § 26 (Am. Law Inst. 2010)). This standard "is familiarly referred to as the 'but-for' test, as well as a *sine qua non* test. Both express the same concept: an act is a factual cause of an outcome if, in the absence of the act, the outcome would not have occurred." Restatement (Third) of Torts: Physical & Emotional Harm § 26 cmt. b. "The requirement that the actor's tortious conduct be necessary for the harm to occur requires a counterfactual inquiry. One must ask what would have occurred if the actor had not engaged in the tortious conduct." *Id.* § 26 cmt. e.

Under the controlling standard, the plaintiffs were required to prove the defendants' breach of the standard of care caused Susie's injury. While the majority is correct in stating that "buzzwords" are not required to prove causation, there must be non-speculative evidence showing the breach or breaches of the standard of care caused the injury at issue. Here, the plaintiffs' specifications of negligence include the following: "failing to thoroughly perform a diagnostic workup," "failing to perform blood work," "failing to culture the swollen and inflamed area of . . . Susie's right elbow and right forearm," "failing to consider an infectious component of her clinical presentation," "failing to implement prophylactic antibiotics," "failing to implement antibiotics responsive to the particular bacterial source of the ongoing infectious process," and "failing to exercise that degree of skill, care and learning ordinarily possessed and exercised by similar healthcare professionals." There is no competent evidence showing a causal connection between any of the specifications of negligence and Susie's injury.

The plaintiffs rely on Dr. Schechter's report for the contention that earlier intervention with antibiotics would have prevented Susie's injuries. However, Dr. Schechter's report is not part of the summary judgment record. The written report was filed as part of the plaintiffs' initial disclosures and was unsworn. *See* Iowa Code § 622.1 (setting forth form to support sworn statement); Iowa R. Civ. P. 1.413(4) ("Any pleading, motion, affidavit, or other document required to be verified under Iowa law may, alternatively, be certified pursuant to Iowa Code section 622.1 . . . ."). "Unsworn expert reports . . . do not qualify as affidavits or otherwise admissible evidence for [the] purpose of [summary judgment], and may be disregarded by the court when ruling on a motion for summary judgment."

*Provident Life and Accident Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) (quoting 11 James WM. Moore et al., Moore's Federal Practice ¶ 56.14[2][c] (3d ed. 1997)); *accord Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157–58 (1970) (providing unsworn statements shall not be considered at summary judgment); *Maytag Corp. v. Electrolux Home Prods., Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006) (collecting cases). This is because the expert report is a disclosure of *expected* testimony. The initial disclosure and unsworn report could have been "cured" and considered as part of the summary judgment record if affirmed by an admissible affidavit or by deposition testimony. *See Maytag Corp.*, 448 F. Supp. 2d at 1065 ("Therefore, while an unsworn expert report, standing alone, does not constitute admissible evidence that can be considered at the summary judgment stage of the proceedings, and will not defeat a motion for summary judgment, an unsworn expert report may be considered at summary judgment where the opinions therein are otherwise adopted or reaffirmed in an admissible affidavit or deposition testimony by the expert."). That did not happen in this case.

Even if the report were to be considered part of the summary judgment record, the report does not generate a genuine issue of disputed fact. In his deposition, Dr. Schechter contradicted his report and testified he could provide no non-speculative opinion on causation. The principles underlying the contradictory affidavit rule are applicable here. *See Estate of Gray v. Baldi*, 880 N.W.2d 451, 462-465 (Iowa 2016) (discussing and applying contradictory affidavit rule). Under that rule, "a party opposing summary judgment may not manufacture a material fact issue simply by filing an affidavit that directly contradicts prior testimony." *Id.* at 462–63. Similarly, a party opposing summary judgment may not manufacture

a material issue of fact by relying on an expert's disclosure of expected testimony contradicted by the expert's subsequent sworn testimony. The heart of the rule is that there is no "genuine" issue because the sworn testimony precludes consideration of contradictory statements in prior or subsequent affidavits. *See id.* Dr. Schechter's report, even if considered on summary judgment, thus fails to generate a genuine issue of fact for trial.

Dr. Schechter's expert opinions, as expressed in his deposition, are insufficient to create a genuine issue of material fact on the element of causation. As an initial matter, it is unclear whether Dr. Schechter is qualified to opine on the issue of causation. He testified he is not an expert in the treatment of necrotizing fasciitis. Even if he were qualified to opine on the issue, he explicitly stated he was not offering an opinion on the question of causation:

> Q. Or are you here to say that Sharon Susie's arm was cut off because of Sara Harty? A. I'm not here to say her arm was cut off because of Sara Harty.

While Dr. Schechter testified there was a high probability that earlier intervention with antibiotics could have averted some tissue loss, he testified this opinion was speculative:

> Q. What I'm getting to, we are speculating on the effect of antibiotics had they been given to Sharon Susie on the afternoon of the 29th of September 2012; correct? A. Yes.

He reaffirmed in his deposition that it was merely "speculative" on whether the antibiotics would "do the desired job." He further opined he did not even have enough information to determine whether antibiotics were an appropriate treatment at the time Susie presented at the urgent care clinic:

Q. Stated another way, you don't have enough information to say whether she should have given antibiotics or not in the circumstances, is that right? A. Correct.

It is well established that speculation and conjecture are insufficient to create a triable issue of fact. *See Waddell*, 2018 WL 4638311, at *3.

The plaintiffs contend they established a prima facie case because Dr. Schechter and many of the treating physicians testified that time is of the essence in treating necrotizing fasciitis. For example, Dr. Schechter testified, "And it's speculative, but clearly time is of the essence when you're getting progressively more ill." I disagree this time-is-of-the-essence testimony is sufficient to demonstrate a triable issue of fact on causation. The testimony is not at all relevant to the question of causation. The factual issue in this case is not whether earlier medical intervention is better than later medical intervention. That is a mere truism of no evidentiary value. The question presented is a counterfactual inquiry: whether Susie would have suffered the same harm if the defendants had not engaged in the allegedly tortious conduct. *See* Restatement (Third) of Torts: Physical & Emotional Harm § 26 cmt. e. More specifically, the question presented is whether the harm could have been averted if Harty had done something different on the day of September 29. The generalized statements upon which the plaintiffs and the majority rely do not and cannot answer that question.

In reaching a contrary conclusion, the majority opinion is in conflict with a case recently filed by this court. In *Waddell v. University of Iowa Community Medical Services, Inc.*, No. 17-0716, 2018 WL 4638311, at *1 (Iowa Ct. App. Sept. 26, 2018), this court affirmed the district court's grant of summary judgment in a medical malpractice case. In *Waddell*, the plaintiff estate alleged the defendants

were negligent in "failing to diagnose and treat cancer in [the patient's] finger during visits to two of its clinics." *Id.* at *1. The plaintiff estate claimed the defendants' negligence caused the patient to have to go undergo amputation of her fingers and ultimately caused her death due to the spread of the late-diagnosed cancer. *See id.* at *2. This court concluded testimony that patients generally do better with earlier intervention was insufficient, as a matter of law, to establish causation:

> The plaintiff focuses his claims on the statements made by two of the doctors, Drs. Milhem and Stone, who both testified that the earlier Christina began treatment, the better. However, we agree with the trial court's assessment that the statements were too generalized to create a genuine issue of material fact regarding causation. Their statements offer no specific relation to the clinic visits and it would be speculative to infer their general statements relate to the clinic. Both Drs. Milhem and Stone testified that melanoma is unpredictable and there are no methods of determining a tumor's growth or progression at any specific point in time prior to being seen or biopsied. Significantly, neither doctor testified that had Christina been diagnosed or seen by UI after her clinic appointments in June, July, or August 2009, her chances of survival would have increased. They offered no probability on a connection between the clinics' actions or inaction and Christina's chance of survival . . . .
>
> . . . .
>
> The plaintiff has only the treating doctors' testimony to establish causation, which the plaintiff conceded during the summary judgment hearing. While, for purposes of summary judgment, the facts of the case must be considered in a light most favorable to the plaintiff and all inferences must be drawn in the plaintiff's favor, we agree with the district court that the deposition testimony of the plaintiff's three experts does not produce sufficient evidence of causation between the defendant's alleged actions or inactions and Christina's illness and ultimate death. Therefore, the plaintiff cannot establish a prima facie case of medical malpractice.

*Id.* at *5.

The majority's conclusion is also directly contrary to the persuasive case of *Bradley v. Rogers*, 879 S.W.2d 947 (Tex. Ct. App. 1994). In that case, two patients each developed necrotizing fasciitis after undergoing liposuction procedures

performed by the same physician. *See id.* at 950. Their respective procedures both occurred on Friday, March 27, 1987. *See id.* On Sunday, March 29, the patients returned to their physician with complaints of severe pain. *Id.* The physician hospitalized both patients. *Id.* At the hospital, a team of physicians treated the patients. *Id.* at 951. On Monday, the patients were diagnosed with necrotizing fasciitis and debridement was recommended. *Id.* at 952. One of the patients survived the procedure, and one deceased. *Id.* The surviving patient and the estate of the deceased patient brought suit against the physician who performed the liposuction and the team of physicians treating the patients upon hospitalization. *Id.* at 950. The plaintiffs asserted a claim of medical malpractice, alleging the physicians breached the standard of care in failing to diagnose and treat the necrotizing fasciitis earlier. *See id.* at 950. A jury returned a verdict in favor of the plaintiffs. *Id.*

The appellate court reversed the jury verdict, finding insufficient evidence to prove causation. *See id.* The court focused on the plaintiffs' expert's lack of specificity with respect to causation. *See id.* at 955–56 The plaintiffs' expert testified, "The sooner you get the dead tissue, surgical debridement of the dead tissue, the shorter the hospital stay, the better the patient is going to do, and the less tissue destruction you're going to have." *Id.* at 956. The expert also testified "that a 'long delay' before surgery 'increases the risk of death and decreases the chance of survival.'" *Id.* The court concluded, "[the expert's] opinion that a patient presenting as [the plaintiffs] did, is generally 'going to do better' or 'be better off' if surgery is not delayed, does not say anything about the particular outcome in this

case and is nothing more than broad conjecture or speculation." *Id.* The court

noted that this non-specific testimony failed to establish causation:

> [The expert] could not specify a precise time at [the hospital] when [the deceased patient] could have been saved. The absence of such specificity by [the expert] is crucial in this case because . . . [i]t is entirely possible that the only time at [the hospital] when [the deceased patient] could have been saved was . . . before she was seen by [the treating physician].

*Id.* at 957.

Susie's case suffers from the same defects as *Waddell* and *Bradley*. Here,

Dr. Schechter and the other doctors could not specify whether the result would

have been different in this case but for the defendants' alleged negligence.

Instead, they could only make generalized statements that the faster a patient

receives care, the better off that patient is. For example Dr. Schechter testified:

> Q: Isn't the bottom line, you don't know what would have happened to Sharon Susie had she had CBC testing, had she returned to the clinic in twenty hours or less than twenty four hours, had a comprehensive physical exam been documented? You don't know that the outcome would not have been exactly the same. True?
> A: I don't know, but the faster you get to care when you're sick the better off you are.

These generalized statements do not show or create a triable issue of fact on

whether the alleged specifications of negligence in this case caused the outcome

in this case. As in *Waddell* and *Bradley*, by the time Susie went to the urgent care

clinic, the infection may have progressed past the point where intervention could

have prevented the harm that ultimately occurred. In other words, there is no non-

speculative opinion or other evidence in the record from which a jury could infer

that if the defendants had done something different on the day Susie presented at

the urgent care clinic, the harm could have been avoided.

The district court thus correctly granted the defendants' motion for summary judgment.  I respectfully dissent.